STATE OF NORTH CAROLINA v. JOHN THOMAS BREEZE

No. COA97-1207

(Filed 4 August 1998)

## 1. Evidence— lineup—not impermissibly suggestive

The physical characteristics of the suspects other than defendant in a armed robbery prosecution did not cause the identification of defendant to be impermissibly suggestive where the age range was identical to that reported for defendant, and the height and weight of the other participants were similar to that of defendant.

## 2. Evidence— lineup—photo and physical—defendant only suspect in both

The trial court did not err in an armed robbery prosecution by denying defendant's motion to suppress identifications where defendant was the only suspect who appeared in both the photo and physical lineups. Each of the three victims who viewed the physical lineup after the photo lineup had a strong motive for and intention to remember the appearance of the perpetrator; each of the victims had ample opportunity to observe the features of the perpetrator; each provided police with a definite, detailed description of the perpetrator based on studying the features of the perpetrator at the scene of the crime; defendant was not distinguished from the other suspects in either lineup; the witnesses were not encouraged to draw more attention to defendant than the other suspects; and each of the witnesses was able to sufficiently identify defendant as the perpetrator.

## 3. Evidence— identification—in-court

There was no error as to in-court identifications of defendant in an armed robbery prosecution where some of the victims who identified defendant at trial had not identified him during lineups. The victims identified defendant as looking like the perpetrator during both the lineup and at trial, identified defendant at trial as looking like the perpetrator even though they had identified another person in a lineup, did not pick defendant during a lineup but identified him at trial as looking like the perpetrator, or chose defendant during the lineup as the person who looked the most like the perpetrator and again pointed him out at trial as looking like the perpetrator. Such discrepancies or inconsistencies go to

the credibility of the witness and do not render the identification inadmissible.

### 4. Criminal Law— joinder of offenses—armed robberies

The trial court did not err in a prosecution for a series of armed robberies by joining all of the offenses for trial where the trial judge determined that the cases appeared to be based on the same act or transaction and constituted parts of a single scheme or plan; the State's theory is confirmed by a close look at the nature of the robberies, the facts and circumstances surrounding each robbery, and the time frame during which each robbery was committed. The nature of the offense charged was consistent throughout all the crimes and the offenses were not so separate in time and place nor so distinct in circumstance as to render consolidation unjust and prejudicial. The primary issue was whether or not defendant committed the crimes and the Court of Appeals could not see how the use of separate defenses by defendant resulted in confusion of the issues.

Appeal by defendant from judgment entered 13 December 1996 by Judge J.B. Allen, Jr. in Alamance County Superior Court. Heard in the Court of Appeals 19 May 1998.

*Attorney General Michael F. Easley, by Assistant Attorney General Francis J. Di Pasquantonio, for the State.*

*David J.P. Barber for defendant-appellant.*

WALKER, Judge.

Defendant, a security guard at Pinkerton, was charged with two (2) counts of assault with a deadly weapon with intent to kill, twenty (20) counts of robbery with a dangerous weapon, and one (1) count of kidnapping. On 10 October 1996, the trial court held a hearing on pretrial motions and subsequently granted the State's motion to join the twenty-three felonies for trial. Defendant's motion to suppress identification of defendant by witnesses was also denied. At trial on 2 December 1996, the State dismissed ten of the felonies and the defendant was tried on the remaining thirteen felonies (12 armed robbery charges and 1 kidnapping charge). The jury found defendant guilty of twelve counts of robbery with a dangerous weapon and not guilty of kidnapping. The trial court sentenced defendant to consecutive active sentences of a minimum of seventy-seven months and a maximum of one hundred and two months on eight of the robbery

charges. The trial court continued prayer for judgment on the remaining four robbery charges.

The State's evidence at trial tended to show the following: In the afternoon of 23 May 1996, a robbery occurred at Williamson Hair Connection in Burlington, North Carolina, by a perpetrator who used a handgun. The three individuals who witnessed this crime, Katie Royster (Royster), Karen Williamson (Williamson), and Shandron Burton (Burton), all stated that the perpetrator covered his face with a hand held towel during the robbery. The perpetrator was described as having a light complexion and wearing a blue tee shirt, blue jeans, dark sunglasses, and a ball cap. During a physical lineup, both Williamson and Burton first identified a man other than defendant as the perpetrator. This person was later investigated by the police and released. Royster made an identification of defendant at the physical lineup but stated that she could not be positive. At trial, all three witnesses identified defendant as looking like the perpetrator.

Around noon on 31 May 1996, a second robbery occurred at Domino's Pizza in Graham, North Carolina, by a perpetrator who used a black .38 caliber revolver. The victim, Fred Ridge (Ridge), described the perpetrator as wearing a blue tee shirt and a ball cap. Ridge positively identified defendant in a physical lineup and at trial.

In the early evening of 8 June 1996, a third robbery occurred at A-1 Rentals in Burlington by a perpetrator who used a dark revolver. The victim, David Surber (Surber), described the perpetrator as having a medium complexion and as wearing a dark tee shirt and dark sunglasses. Surber later positively identified the defendant in a physical lineup and at trial.

In the early afternoon of 28 June 1996, a fourth robbery occurred at Clayton & Associates in Burlington, North Carolina, by a perpetrator who used a rusty brown butcher knife. The victim, Amy Clayton (Clayton), described the perpetrator as wearing a black shirt, black pants, dark sunglasses, and a ball cap. Although the perpetrator held his head down during the robbery, Clayton made a positive identification of the defendant in a physical lineup and at trial.

In the morning of 4 July 1996, a fifth robbery occurred at the Alabaster Box store in Burlington, from which the perpetrator left in a mid-sized, silver/blue automobile. The perpetrator used a small, silver knife during the robbery and took a twenty-five automatic chrome pistol from the victim, Shirley Bernatawicz (Bernatawicz).

She described the defendant as having a medium complexion and as wearing a white tee shirt, green shorts, and a ball cap. Bernatawicz was able to identify the defendant in a physical lineup and at trial. In the evening of 6 July 1996, a sixth robbery occurred at the Downtown Sports Club in Burlington, from which the perpetrator left in a blue Buick automobile. The perpetrator used a small, chrome, semi-automatic pistol during the robbery. The victim, McKinzey Swink (Swink), described the defendant as having a light complexion and as wearing a gray tee shirt, blue jeans, dark sunglasses, and a ball cap. Swink identified the defendant in a physical lineup as well as at trial. Swink did not make any identification during an earlier photo lineup.

In the late afternoon of 9 July 1996, a seventh robbery occurred at the Sneakee Feet in Burlington by a perpetrator who used a chrome handgun. Jennifer Beck (Beck), the victim, described the perpetrator as having a light complexion and as wearing a white tee shirt, blue jeans, and dark sunglasses. Beck stated that the perpetrator had his hand over his face during the robbery, and initially she identified a suspect other than defendant as the perpetrator during a physical lineup. However, at trial, Beck identified defendant as looking like the perpetrator.

In the mid-afternoon of 12 July 1996, an eighth robbery occurred at Pic n' Pay Shoes in Burlington, by a perpetrator who used a small, silver, semi-automatic pistol. Teresa Vanhook (Vanhook), the victim, described the perpetrator as having a light or medium complexion and as wearing a gray tee shirt, blue jeans, dark sunglasses, and a ball cap. Vanhook identified a suspect other than defendant from the physical lineup. At trial, Vanhook identified the defendant as looking like the perpetrator.

Also in the afternoon of 12 July 1996, a ninth robbery occurred at Burlington Medical in Burlington, by a perpetrator who used a silver handgun. Rose May (May), the victim, described the perpetrator as wearing a blue tee shirt, dark sunglasses, and a ball cap. May identified a suspect other than defendant at the physical lineup; however, at trial, she identified the defendant as looking like the perpetrator.

Around noon on 14 July 1996, a tenth robbery occurred at Service Distributors in Burlington. The perpetrator used a small, semi-automatic pistol and left in a blue Buick automobile. The two witnesses to this crime, Trent Daye (Daye) and Daye's girlfriend, described the perpetrator as wearing a blue shirt, blue/gray pants, dark sunglasses, and a ball cap. Daye testified that after the robbery, the perpetrator

fired a shot at him from over his shoulder as he ran from the store. Daye's girlfriend testified that upon retreating to a blue Buick automobile, the perpetrator turned from inside the vehicle and fired twice from over his shoulder at her. Daye's girlfriend then returned fire at the blue Buick with a twelve gauge shotgun which shattered the Buick's rear window. A shotgun casing was found at the scene, although police were unable to find spent bullets fired by the perpetrator. Daye and his girlfriend reported the license plate number of the vehicle the perpetrator had used and identified the defendant in the physical lineup. Daye also identified the defendant at trial.

Police linked the license plate number to defendant's mother's residence in Burlington, where defendant also resided. There they found a blue Buick which was registered in defendant's mother's name. The automobile's license plate matched the description given by witnesses except for the prefix. A tarp covered the back window and when it was removed the police determined the back window had been shot out, leaving multiple pellet marks. Charles McLelland (McLelland), a forensic chemist and expert witness for the State, tested the head liner of the Buick and concluded that a gun had been fired from inside the automobile.

Also found at the residence was a butcher knife with a wooden handle, which matched the description of a weapon used at some of the robberies. Defendant was found inside the house, was interviewed by police, and then charged with robbery and assault in connection with the robbery which took place at Service Distributors.

In addition to the similarities of the robberies reported by the witnesses, some witnesses stated the perpetrator demanded, "[G]ive me the money." In each of the robberies, money was turned over to the perpetrator. The witnesses also consistently described the perpetrator as being anywhere from 5 feet 6 inches to 6 feet tall and having a slender build, medium build, or a body weight consisting anywhere from 130 to 180 pounds. The witnesses estimated the perpetrator's age as either in his twenties to thirties, mid-thirties, or from thirty to forty years. The perpetrator was always described as a black male, usually wearing sunglasses, a ball cap, a tee shirt, and blue jeans or dark colored pants. Some witnesses described the defendant's complexion as light or medium.

A photo lineup took place on 14 July 1996, during which time the witnesses Swink, Bernatawicz, and Burton viewed photographs of five individuals, one of which was the defendant. Swink and

Bernatawicz did not identify the defendant, but Burton did, noting that defendant was the only person in the photo lineup who had all of the features of the perpetrator, even though she could not be sure.

A physical lineup took place on 16 July 1996 and was comprised of seven males including the defendant. Each lineup participant wore sunglasses which were removed for witnesses who saw the perpetrator without sunglasses. Each lineup participant also wore a tee shirt. The lineup was viewed individually by each witness from approximately twenty feet away. Defendant was the only person in this lineup who was also in the earlier photo lineup which had been viewed by three of the witnesses.

The defendant testified that he had been at Service Distributors on the date of the robbery, but that he neither committed nor observed a robbery. He stated that he had an argument with the clerk and left after the clerk fired a shot at him. The defendant called a forensic chemist and expert witness, William Best (Best), who testified that tests performed on the pants and shirt worn by defendant at the time of his arrest showed no signs of powder burns. Best also stated that small pieces of glass embedded in the shirt matched the density of the glass taken from the Buick, but showed no signs of powder burns. Upon testing the head liner, Best concluded that a handgun had not been fired from within the car, but that powder in the car came from a shotgun pellet fired from the gun used by Daye's girlfriend.

As to the other businesses, defendant denied that he had been present on the dates of the robberies. Defendant's relatives testified that he had been at a family gathering in Ossipee on the day of the Alabaster Box robbery. Defendant stated that he had never been to Burlington Medical, Domino's Pizza, and The Alabaster Box Gift Shop. Defendant admitted to having been to Pic n' Pay Shoes and the Downtown Sports Club but not on the dates of the robberies.

In his first and second assignments of error, defendant argues that the trial court erred by allowing the in-court identification of defendant by witnesses Beck, Bernatawicz, Burton, May, Royster, Surber, Swink, Vanhook, and Williamson because such identification was tainted or improper. Defendant thereby contends that the in-court identification of these witnesses should have been suppressed, or alternatively, that the charges against him should have been dismissed.

In support of his contention, defendant provides the following: (1) defendant was the only man in the physical lineup who met the approximate physical description of the perpetrator; and (2) defendant was the only man who appeared in both the photo lineup and the physical lineup.

Defendant relies on *State v. Harris*, 308 N.C. 159, 301 S.E.2d 91 (1983), for support that evidence from an improper pretrial identification procedure is not admissible due to its impermissibly suggestive tendency to create a substantial likelihood of irreparable misidentification.

The procedure must be irreparably suggestive, resulting in the strong probability of misidentification and violation of due process. *State v. McCraw*, 300 N.C. 610, 613-614, 268 S.E.2d 173, 175-176 (1980). The test for determining the existence of irreparable misidentification includes several factors: (1) the opportunity of the witness to view the perpetrator at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the perpetrator; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *State v. Wilson*, 313 N.C. 516, 529, 330 S.E.2d 450, 460 (1985). In other words, a suggestive identification procedure has to be unreliable under a totality of the circumstances in order to be inadmissible. *State v. McCraw*, 300 N.C. at 613-616, 268 S.E.2d at 175-177. Even when a pretrial procedure is found to be unreliable, in-court identification of independent origin is admissible. *State v. Headen*, 295 N.C. 437, 439, 245 S.E.2d 706, 708 (1978).

[1] We will first address whether the physical characteristics of the suspects other than defendant in the physical lineup caused the identification of the defendant to be impermissibly suggestive. The State's evidence showed that the physical descriptions of the suspect given by witnesses to the robberies for which the defendant was charged include a black man in his twenties, thirties, or forties, with either a light or medium complexion. The height ranged from 5 feet 6 inches to 6 feet, with reported weights ranging from 130 to 180 pounds. The physical lineup was comprised as follows: (1) a 49-year-old black man with medium to dark skin, 6 feet in height, and 185 pounds in weight; (2) a 38-year-old black man with a height of 5 feet and 10 inches, a weight of 220 pounds, and balding hair; (3) a 39-year-old black man with a light complexion and a height of six feet and two inches; (4) a 28-year-old black man with a medium complexion, 5 feet and 9 inches in height, and 195 pounds in weight; (5) a 44-year-old black man with

a medium complexion, and a height of six feet and one inch; (6) defendant; and (7) a 40-year-old black man with a medium complexion, balding head, height of 5 feet and 10 inches, and a weight of 200 pounds. The height of these men were between 5 feet and 9 inches to 6 feet and 1 inch, the weights were between 185 to 200 pounds, and the ages ranged from 28 to 40. However, defendant insists that all of the men in the lineup except for defendant could be eliminated because they did not share the defendant's precise physical description. Our Supreme Court has held that all suspects in a physical lineup are not required to have characteristics identical to that of the defendant. *State v. Clark*, 301 N.C. 176, 182 (1980), 270 S.E.2d 425, 430 (1980). Only a reasonable similarity is required. *Id.*

This case is analogous to *State v. Gaines*, 283 N.C. 33, 194 S.E.2d 839 (1973), where a defendant who was fifteen years of age argued that his lineup procedure was impermissibly suggestive because no other participant in the lineup shared his exact physical characteristics. *Id.* at 39-40, 194 S.E.2d at 843-844. All of the lineup participants were between three and nine years older than defendant, only two lineup participants shared defendant's height, and all lineup participants were between fifteen to thirty-five pounds heavier than defendant. *Id.* at 39, 194 S.E.2d 844. The Court agreed that there was some disparity in age, height, and weight of the lineup participants, but held the differences did not result in an irreparably suggestive tendency resulting in mistaken identification as to deny due process. *Id.* at 40, 194 S.E.2d 844. The Court went on to say that the State is not required to produce a lineup of subjects who are identical to the suspect because no two men are exactly alike, and the mere fact that defendant was the lightest and youngest person did not invalidate the lineup. *Id.*

In the instant case, we find the physical characteristics of the men in the lineup to be reasonably similar to that of the defendant. The age range of the other lineup participants were identical to the age range reported for the defendant. The height and weight of the other participants were similar to that of the defendant. Based upon these facts, the trial court properly concluded that the physical lineup procedure was not tainted nor did the makeup of this lineup result in an irreparably suggestive likelihood resulting in misidentification of the defendant.

[2] Next, we must determine whether defendant was prejudiced by being the only suspect in the photo lineup who was also in the phys-

ical lineup. Defendant again relies on *Harris*, 308 N.C. at 159, 301 S.E.2d at 91, in support of his allegation that the photo lineup procedure was tainted. In *Harris*, the victim was able to view the perpetrator with the use of her glasses, in sunny weather, and from at least three feet away. *Id.* at 165, 301 S.E.2d at 95. In her description of the perpetrator to the police, the victim mentioned that he wore a small blue cap and a pink and blue neck scarf. *Id.* at 165, 301 S.E.2d at 96. The victim was later shown a mug book which included some photographs of men wearing hats, as well as a photograph of the perpetrator wearing a cap and scarf matching the description earlier given by the victim. *Id.* at 162, 301 S.E.2d at 94. The victim identified defendant as her assailant and the defendant contended that the photo lineup was impermissibly suggestive due to his wearing apparel in the photograph which had been described by the victim as the perpetrator's apparel. *Id.* at 164, 301 S.E.2d at 95.

In refusing to find that the trial court erred by admitting the pretrial photo identification procedure, the Court stated that the victim's identification of the photograph was based on her memory of the encounter she had with the defendant the day before. *Id.* at 165-166, 301 S.E.2d at 95-96. The Court further stated that the victim had a strong motive for and intention to remember the appearance of her assailant. *Id.* at 165, 301 S.E.2d at 95. On this basis, the Court found the pretrial photo identification procedure was not tainted. *Id.* at 165-166, 301 S.E.2d at 95-96.

A pre-trial identification procedure found to be unduly suggestive may still be admissible if deemed to be sufficiently reliable. This is illustrated in *State v. Capps*, 114 N.C. App. 156, 441 S.E.2d 621 (1994), where witnesses to a crime individually identified the defendant who was sitting alone in a police car. *Id.* at 162, 441 S.E.2d at 625. The witnesses were not shown any other suspects and were told by police officers that they had the man in custody, but that the man's mustache was gone and that his clothing was different. *Id.* Despite this Court's determination that the identification procedure was unduly suggestive, it was held to be sufficiently reliable and did not tip the scales against the defendant based upon a totality of circumstances including other descriptions witnesses had given of the suspect. *Id.* at 162-163, 441 S.E.2d at 625.

In the present case, each of the three victims who viewed the physical lineup after the photo lineup had a strong motive for and intention to remember the appearance of the perpetrator. Each of the

victims had ample opportunity to observe the physical features of the perpetrator. Even in the two robberies where the perpetrator covered his face with a hand held towel or with his hand, witnesses testified to observing his complexion, body shape, and height. Witness Burton testified that she had viewed the perpetrator's full face in a window before he covered it and entered the business. Each victim provided the police with a definite, detailed description of the perpetrator, based upon studying the physical features of the perpetrator at the scene of the crime. The defendant was not distinguished from the other suspects in either lineup, as the other men in the lineup matched the defendant's general physical description. The witnesses were not encouraged to draw more attention to the defendant than the other suspects. Further, each of the witnesses was able to sufficiently identify the defendant as the perpetrator, either during a photo or physical lineup or in court.

[3] As to the in-court identifications, even though Bernatawicz and Swink did not pick the defendant during a photo lineup, each identified the defendant as looking like the perpetrator during a physical lineup and at trial. Although Burton, Beck, Vanhook, and Williamson each identified a person other than defendant in a lineup, they later identified defendant at trial as looking like the perpetrator. May likewise did not pick the defendant during a physical lineup but identified him at trial as the person who looked like the perpetrator. Royster and Surber each testified that they chose the defendant during the physical lineup as the person who looked most like the perpetrator, and at trial they again pointed out the defendant as looking like the perpetrator.

When a witness makes an error in identifying the perpetrator in a lineup, such discrepancies or inconsistencies go to the credibility of the witness and does not render the identification inadmissible. *State v. Eure*, 61 N.C. App. 430, 434, 301 S.E.2d 452, 455 (1983) (citation omitted). This is likewise true when a witness cannot make a positive identification of a suspect but identifies the suspect as the one who most closely resembles the perpetrator. The tentativeness or uncertainty of identification does not render the testimony inadmissible but goes to its weight. *State v. Pridgen*, 313 N.C. 80, 86, 326 S.E.2d 618, 623 (1985) (citation omitted).

In viewing the totality of circumstances, we conclude the trial court did not err in denying defendant's motion to suppress the in-court identifications of defendant. The State's evidence permitted

reasonable inferences of the defendant's guilt and the trial judge properly denied the defendant's motion to dismiss.

[4] In his next assignment of error, defendant argues that the trial court erred in permitting consolidation of all the charges for trial. Joinder of offenses is governed by N.C. Gen. Stat. § 15A-926(a) which provides:

> Two or more offenses may be joined in one pleading or for trial when the offenses, whether felonies or misdemeanors, or both, are based on the same act or transaction or on a series of acts or transactions connected together or constituting parts of a single scheme or plan. Each offense must be stated in a separate count as required by G.S. 15A-924.

N.C. Gen. Stat. § 15A-926(a) (1997).

In order to grant a motion to consolidate, a trial court must first find that the offenses took place within a common scheme or plan. *State v. Floyd*, 115 N.C. App. 412, 416, 445 S.E.2d 54, 57-58 (1994), *cert. denied*, 339 N.C. 740, 454 S.E.2d 658 (1995), *affirmed*, 343 N.C. 101, 468 S.E.2d 46 (1996). In doing so, the court should consider the nature of the offenses to be joined and the commonality of facts. *Id.* Secondly, the court must find that the consolidation does not prejudice the defendant by hindering his ability to receive a fair trial and present a defense. *Id.* at 416-417, 445 S.E.2d at 58. Absent an abuse of discretion, a trial court's ruling will not be disturbed on appeal. *State v. Avery*, 302 N.C. 517, 524, 276 S.E.2d 699, 704 (1981) (citation omitted). The test is whether the offenses are so separate in time and place and so distinct in circumstances as to render a consolidation unjust and prejudicial to defendant. *State v. Greene*, 294 N.C. 418, 423, 241 S.E.2d 662, 665 (1978).

In considering the nature of offenses to be joined and the commonality of facts, the trial court should also consider the lapse of time between offenses, *State v. Clark*, 301 N.C. 176, 270 S.E.2d 425 (1980), and the unique circumstances of each case, *State v. Boykin*, 307 N.C. 87, 296 S.E.2d 258, 261 (1982) (citation omitted).

In the instant case, defendant contends that each robbery was a separate and distinct transaction. However, in allowing the State's motion to consolidate, the trial judge determined that the cases appeared to be based on the same act or transaction and constituted parts of a single scheme or plan. The State's theory is confirmed by a close look at the nature of the robberies committed,

the facts and circumstances surrounding each robbery, and the time frame during which each robbery was committed, all of which bring to view a pattern of offenses committed by the defendant.

Also, the nature of the offense charged is consistent throughout all these crimes. The victims described his dress in similar terms: blue jeans or other dark pants, a tee shirt, and a ball cap and/or sunglasses. The defendant was always alone and most of the victims were female. Defendant consistently threatened his victim with a handgun or a knife and all but two of the robberies occurred during daylight hours. The robberies were committed within Alamance County and all took place within seven weeks, constituting a string of one-man robberies. We thus conclude that these offenses are not so separate in time and place nor so distinct in circumstances as to render consolidation unjust and prejudicial. *State v. Greene*, 294 N.C. at 423, 241 S.E.2d at 665.

Defendant further contends that joinder of the thirteen felonies for trial prejudiced his defense due to a confusion of issues. Defendant attributes the existence of jury confusion to his use of one defense for the robbery which took place at Service Distributors and his employment of a separate defense for the other nine robberies. Defendant further contends that since the jury could assume that he was present at the robbery which took place at Service Distributors, the jury was allowed to infer that the defendant was also present at the other robberies.

Regardless of the defendant admitting to being present at Service Distributors when the altercation took place, he denied participation in all of the robberies for which he was charged. Thus, the primary jury issue in all ten robberies was whether or not the defendant committed those crimes. We fail to see how the use of separate defenses by defendant resulted in confusion of the issues. There is likewise nothing in the record to support defendant's contention that the jury concluded his presence at all robbery locations due to his admitted presence at one robbery location.

The record does show that the jury was given a separate verdict sheet for each charge. Each verdict sheet listed the name of the alleged victim and the offense for which the defendant was to be found guilty or not guilty. This supports our conclusion that the jury fairly determined defendant's guilt or innocence of each offense, as required by N.C. Gen. Stat. § 15A-927(b)(2) (1997).

We hold that the trial court, acting in the exercise of its discretion, properly joined the cases for trial.

In summary, the defendant received a fair trial, free of prejudicial error.

No error.

Chief Judge EAGLES and Judge HORTON concur.