McCULLOUGH, Judge.
Defendant Steven Lamonte Stitt appeals his convictions of robbery with a dangerous weapon, possession of a firearm by a felon, and attaining habitual felon status. For the reasons stated herein, we find no error.
I. Background
On 25 February 2013, defendant was indicted on charges of robbery with a dangerous weapon and for attaining habitual felon status. On 1 July 2013, defendant was also indicted for possession of a firearm by a felon. The trial court joined these offenses for trial. Defendant's trial commenced at the 7 April 2014 session of Mecklenburg County Superior Court, the Honorable Forrest D. Bridges presiding.
On 14 April 2014, a jury found defendant guilty of robbery with a dangerous weapon and possession of a firearm by a felon. Defendant pled guilty to attaining habitual felon status. Defendant was sentenced as a habitual prior record level V and sentenced to 127 to 165 months imprisonment.
State's Evidence
Audrey Burk Carter testified that on 26 July 2012, she was working as a teller at a Wells Fargo Bank ("the bank") in Mecklenburg County, North Carolina. The service manager of the bank, Deanne Haile, also served as teller that day. Out of four different stations, Ms. Carter was servicing customers at station two and Ms. Haile was tending at station one. A man entered the bank around 12:30 p.m., when no other customers were around, and stopped at station three. The man had a bandaid on the left side of his neck that was not secure and dangling. Ms. Haile assisted the man. Ms. Carter testified that she was able to get "a good look" at the man. She described him as being "a heavy set man, tall, about six feet or more, dark skinned, had a dark hat, dark clothes. I'd seen him before." Ms. Carter recalled seeing him at other branches of Wells Fargo Bank. She testified that, "[h]e had one of the hats, you know, and the glasses, but I still see him without it. I knew what he looked like. Salt and pepper hair, balding in the back, you know, something was wrong with his teeth. I remember him." Ms. Carter identified defendant as the man she saw in the bank on 26 July 2012.
Ms. Carter testified that Ms. Haile stated to defendant, "how can I assist you today" and defendant laid a black bag on the counter. Ms. Carter saw that defendant had a black, automatic gun. He said "yeah, you can fill that up with money." Defendant stated, "fill the bag up with no little money, no dye packs. He said don't nobody look at me, because I was staring at him, so he said don't nobody look at me." Defendant told Ms. Haile to "hurry up, cocked the gun, and asked her if she wanted to die[.]" She replied "no sir. "Ms. Carter screamed, causing the employees on the other side of the bank to come out of their offices and look out, and thereafter pressed the emergency button which "signal [ed] to the police department that something is wrong." Ms. Haile gave defendant the bag and he ran out of the bank.
Ms. Haile testified that on 26 July 2012, she was working at the bank when a man entered between 12:30 and 1:00 p.m. She welcomed him and asked how he was doing. The man "seemed to just kind of hover" and then threw a bag over the counter and told Ms. Haile to "fill the bag with large bills, no funny money, no dye packs, no tracker packs, and no small bills." Ms. Haile complied with his demands and turned over between $20,000.00 and $25,000.00 to the man. Ms. Haile described the man as "in all black with a hat, glasses and bandaids, what appeared to be bandaids on the left side of his neck." The man was standing in front of her and stated "don't nobody even look[.]" Ms. Haile never saw a gun but heard the man cock one. Ms. Haile was not able to "get a good look" of the man's face. She testified that she did not recognize him from any previous interactions.
A photographic lineup, State's Exhibit 1, was shown to Ms. Carter on 1 August 2012 by Detective Richard Andringa of the Charlotte-Mecklenburg Police Department ("CMPD"). Detective Andringa presented Ms. Carter with a "double blind sequential lineup," showing her the individual photographs sequentially. Ms. Carter selected photograph number two, which was a photograph of defendant, as being the perpetrator on the events of 26 July 2012. Ms. Carter stated that "she was positive" of her choice.
Hearing on Defendant's Motion to Suppress
On 3 January 2014, defendant filed a motion to suppress any identification of defendant by Ms. Carter, arguing that the pretrial identification procedures of the CMPD violated his rights under the United States and North Carolina Constitutions and the Eyewitness Identification Reform Act. A pre-trial hearing was held on 7 April 2014.
Todd Stutts, a detective with the CMPD, testified during voir direthat he was involved in the investigation of the bank robbery in July 2012. He compiled the photographic lineup, State's Exhibit 1, that was shown to Ms. Carter by Detective Andringa. The photographic lineup included a picture of defendant obtained through the Department of Motor Vehicles. There were five additional photographs, known as "filler photographs," ("fillers") of individuals obtained from the Mecklenburg County mugshot system. Detective Stutts had access to the general description of defendant as provided by the witnesses.
Detective Stutts testified that although he could not recall exactly, he probably searched for photographs of black males between the ages of forty to fifty years old. He "ma[d]e every effort to put someone in naturally of the same race, the same sex. We try to get as close to age as possible, hairstyles, things of that nature." Detective Stutts did not want the filler photographs "to look alike.... I don't want them all to be basically the same person[.]"
Pursuant to questions by defense counsel regarding the hair and hairstyles of the individuals in State's Exhibit 1, Detective Stutts noted that the number one filler was of a man with "more hair than anybody" while defendant did not have much hair on his head and appeared to be "practically bald headed[.]" The suspect in the bank robbery was wearing a hat so Detective Stutts chose from a variety of hairstyles.
Pertaining to facial hair, Detective Stutts testified that defendant's photograph appeared to have a small mustache. Detective Stutts admitted that five out of the six individuals in the photographic lineup had facial hair in their photographs even though he could not recall whether any witnesses had described the bank robber as having a beard. The following exchange occurred.
[Defense Counsel]: So, but wouldn't it be fair to say that if a witness didn't give as a part of the description facial hair, and you put people with facial hair in the lineup, that they could eliminate that person, can't they?
[Detective Stutts]: I don't think so. I think men can shave and grow beards.
In regards to the complexions of the fillers, Detective Stutts testified that Ms. Carter's description of the bank robber described him as having dark skin. Detective Stutts stated that he did not "want their appearance to be similar as if they're related or something like that" but that all the five filler photographs were "close in complexion." He noted that filler number six had the lightest skin tone, lighter than defendant. The following exchange took place between the trial court judge and Detective Stutts:
THE COURT: So my question to you is this. In entering this data into the computer as to race, sex, age, height, weight, or what other factors you used, were you entering those factors based on the appearance of [defendant] or based on the description of the perpetrator as given to you by the eyewitnesses?
[Detective Stutts]: The lineups would have been based on the named suspect, on [defendant.]
Detective Stutts explained that he did not want all the fillers to "look exactly alike" or "basically be twins[.]" However, he did want them to be in the same "race, naturally things of that nature, the same age range."
At the conclusion of the hearing, the trial court held the following:
Having considered all the testimony, and reviewed the exhibits, and read the cases, and considered the arguments of counsel, this Court concludes that the photographic lineup procedures used in this case did not employ an impermissibly suggestive procedure.
And that the photographic lineup identification procedure was not so suggestive and conducive to irreparable mistaken identity as to offend fundamental standards of decency and justice. Therefore the motion to suppress is denied on due process rights.
The trial court further held that "there were some instances in which there was not full compliance with [the Eyewitness Identification Reform Act codified in N.C. Gen.Stat. § 15A-284.52 ]." In particular, the trial court found non-compliance with N.C. Gen.Stat. § 15A-284.52(b)(5) (2013) which states that "[t]he lineup shall be composed so that the fillers generally resemble the eyewitness's description of the perpetrator, while ensuring that the suspect does not unduly stand out from the fillers" and N.C. Gen.Stat. § 15A-284.52(b)(5) a. which states that "[a]ll fillers selected shall resemble, as much as practicable, the eyewitness's description of the perpetrator in significant features, including any unique or unusual features." The trial court found compliance with all other portions of the Eyewitness Identification Reform Act and held that the appropriate remedy given the nature of the violations "were not significant or substantial enough so as to call for a suppression of the identification by the witness." Rather, the trial court chose to remedy the situation through appropriate jury instructions that would instruct the jury upon the requirements of the statute and instruct the jury that the failure to comply with the requirements "may be considered to determine the reliability of eyewitness identification in this case."
II. Standard of Review
The applicable standard of review of a trial court's denial of a motion to suppress is "strictly limited to determining whether the trial [court]'s underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the [court]'s ultimate conclusions of law." State v. Salinas,366 N .C. 119, 123, 729 S.E.2d 63, 66 (2012) (citation omitted).
We note that the record does not contain any written order determining defendant's motion to suppress. Although N.C. Gen.Stat. § 15A-977(f) provides that "[t]he [trial] judge must set forth in the record his findings of facts and conclusions of law[,]" our Courts have interpreted this statute to require a written order unless (1) "the trial court did provide its rationale from the bench" and (2) "there [was] no material conflict in the evidence on voir dire[.]" State v. Shelly,181 N.C.App. 196, 204-205, 638 S.E.2d 516, 523 (2007) (citation and quotation marks omitted). Because the trial court in the instant case provided its rationale from the bench and there was no material conflict in the evidence presented on voir dire,the trial court's failure to enter a written order was not error. Therefore, we must determine whether the trial court's implied findings are supported by competent evidence, and whether those findings support the legal conclusions.
III. Analysis
Defendant's sole argument on appeal is that the trial court erred by denying his motion to suppress a pre-trial identification of defendant by Ms. Carter, thereby violating his due process rights under the Fifth and Fourteenth Amendments of the United States Constitution and the North Carolina Constitution. Defendant argues that the photographic lineup "was impermissibly suggestive and conducive to irreparable mistaken identification so as to offend fundamental fairness."
"[D]ue process does not require that all participants in a lineup be identical, all that is required is that a lineup be a fair one and that the officers conducting it do nothing to induce the witness to select one participant rather than another." State v. Rainey,198 N.C.App. 427, 434-35, 680 S.E.2d 760, 767 (2009) (citation omitted). However, "[i]dentification evidence violates a defendant's due process right where the facts reveal a pretrial identification procedure so impermissibly suggestive that there is a very substantial likelihood of irreparable misidentification." State v. Jones,216 N.C.App. 225, 231, 715 S.E.2d 896, 901 (2011) (citation and quotation marks omitted). "A due process analysis requires a two-part inquiry." State v. Rogers,355 N.C. 420, 432, 562 S.E.2d 859, 868 (2002).
First, the Court must determine whether the pretrial identification procedures were unnecessarily suggestive. If the answer to this question is affirmative, the court then must determine whether the unnecessarily suggestive procedures were so impermissibly suggestive that they resulted in a substantial likelihood of irreparable misidentification. Whether a substantial likelihood exists depends on the totality of the circumstances.
Jones,216 N.C.App. at 231, 715 S.E.2d at 901 (citation omitted).
"To determine whether a pretrial identification procedure is suggestive, the court should consider: (1) whether the accused is somehow distinguished from others in the line-up or in a set of photographs; and (2) whether the witness is given some extraneous information by the police which leads her to identify the accused as the perpetrator of the offense." Rainey,198 N.C.App. at 435, 680 S.E.2d at 768 (citation and quotation marks omitted).
Here, defendant argues that the pretrial identification procedures were unnecessarily suggestive because although "there was no testimony the robber had a beard at the time of the robbery," three of the fillers, numbers 3, 4, and 6, had various amounts of facial hair. Defendant also argues that although Ms. Carter described the perpetrator as dark in complexion, two of the fillers, numbers 1 and 6, were light in complexion. As such, defendant argues that two of the six photographs were impermissibly suggestive. We find defendant's arguments to be without merit.
At the conclusion of the hearing on defendant's motion to suppress, the trial court stated as follows:
Having considered all the testimony, and reviewed the exhibits, and read the cases, and considered the arguments of counsel, this Court concludes that the photographic lineup procedures used in this case did not employ an impermissibly suggestive procedure.
And that the photographic lineup identification procedure was not so suggestive and conducive to irreparable mistaken identity as to offend fundamental standards of decency and justice. Therefore the motion to suppress is denied on due process rights.
Although there were some disparities among the individuals in the contested photographic lineup in terms of hairstyle, facial hair, and complexion, these differences do not render the State's Exhibit 1 so impermissibly suggestive that it must be excluded as violating defendant's right to due process. Here, the voir diredisclosed that the lineup was compiled by Detective Stutts and that he had access to the general description of defendant as provided by the witnesses. The photographic lineup was comprised of six black males, including defendant, between the ages of forty to fifty years old. Detective Stutts testified that the suspect in the bank robbery was wearing a hat, so he chose from a variety of hairstyles. Detective Stutts admitted that five out of the six individuals in the photographs had facial hair, but testified that because "men can shave and grow beards" he included them in the lineup. Detective Stutts also testified that he believed all the individuals in the photographs to be "close in complexion." Another officer with the CMPD, Detective Andringa, presented the photographic lineup to Ms. Carter and was not involved in the investigation of this robbery. Detective Stutts testified that because Detective Andringa had no knowledge of the suspect, he "wouldn't be able to guide someone in the right or wrong direction."
It is well established that "[t]he State is not required to produce lineup subjects who are in all respects identical to the suspect. If such were the rule, no lineup would be valid because no two men are alike." State v. Gaines,283 N.C. 33, 40, 194 S.E.2d 839, 844 (1973). "Only a reasonable similarity is required." State v. Breeze,130 N.C.App. 344, 351, 503 S.E.2d 141, 146 (1998). The physical characteristics of the fillers were reasonably similar to those of defendant. In addition, there is no evidence that Ms. Carter was given any extraneous information by the police that lead her to identify defendant as the perpetrator of the bank robbery. Accordingly, we hold that the trial court did not err in holding that there was not an impermissibly suggestive procedure employed.
Moreover, even if the photographic lineup shown to Ms. Carter was impermissibly suggestive, we conclude that it was not so suggestive that there was a substantial likelihood of irreparable misidentification. In determining whether there is a substantial likelihood of irreparable misidentification,
our courts look at the totality of the circumstances, guided by five factors: (1) the opportunity of the witness to view the perpetrator at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description; (4) the level of certainty demonstrated by the witness at the pre-trial identification; and (5) the time between the crime and the pre-trial identification.
State v. Roberts,135 N.C.App. 690, 694, 522 S.E.2d 130, 133 (1999).
Ms. Carter testified that she got a "good look" of the perpetrator on 26 July 2012. She recognized him from prior occasions and the perpetrator was standing "directly in front of" her. The photographic lineup was shown five days after the crime. Ms. Carter also testified that she was "certain" and "positive" defendant was the perpetrator. Considering the totality of the circumstances, there was not a substantial likelihood of irreparable misidentification. Thus, we hold that the trial court did not err in denying defendant's motion to suppress.
NO ERROR.
Judges CALABRIA and DIETZ concur.
Report per Rule 30(e).
Opinion
Appeal by defendant from judgment entered 14 April 2014 by Judge Forrest D. Bridges in Mecklenburg County Superior Court. Heard in the Court of Appeals 17 March 2015.