STATE OF NORTH CAROLINA v. TERENCE LEVONNE GARNER

No. COA98-1215

(Filed 21 December 1999)

## 1. Indigent Defendants— funds for expert witness—eyewitness identification

The trial court did not abuse its discretion by denying defendant's motion for funds to employ an eyewitness identification expert where defendant failed to make the required threshold showing that he would be deprived of a fair trial without the expert assistance or that there was a reasonable likelihood that the expert assistance would materially assist him in the preparation of his case.

## 2. Indigent Defendants— funds for expert witness—ex parte hearing on motion

The trial court did not abuse its discretion by refusing defendant's request for an ex parte hearing on his motion for funds to employ an eyewitness identification expert. While access to the basic tools of an adequate defense is a core requirement of a fundamentally fair trial, the need for an ex parte hearing on a motion for expert assistance is not. And, while it has been held that the trial court is constitutionally required to grant indigent defendants an ex parte hearing to establish the need for a psychiatric expert, a request for an eyewitness identification expert does not require the constitutional protections afforded the request for a psychiatric expert.

1

STATE v. GARNER

[136 N.C. App. 1 (1999)]

**3. Evidence— identification—eyewitness**

The trial court did not err at a hearing on a motion for appropriate relief by denying defendant's motion to suppress identification testimony from the victims of a robbery and shooting. Under the totality of the circumstances, there was no substantial likelihood of irreparable misidentification and the identifications were not impermissibly suggestive.

**4. Criminal Law— motion for appropriate relief—newly discovered evidence—confession**

The trial court did not abuse its discretion by denying defendant's motion for appropriate relief with regard to the confession of a cousin of an accomplice. The trial court is in the best position to judge the credibility of a witness and found in this case that defendant had failed to prove that the cousin's statements to authorities were probably true.

**5. Criminal Law— motion for appropriate relief—recanted testimony**

The trial court did not abuse its discretion by denying a motion for appropriate relief based upon recanted testimony where there was not a reasonable possibility that a different result would have been reached in light of other testimony.

**6. Criminal Law— prosecutorial misconduct—use of false testimony**

The trial court did not abuse its discretion by denying defendant's motion for appropriate relief based upon the State's use of false testimony where it was implicit in the trial court's order that the testimony was probably not false except in regard to the witness having a cousin named Terence and defendant failed to establish that the witness otherwise perjured himself at trial.

**7. Appeal and Error— motion for appropriate relief on appeal—newly discovered evidence**

Defendant's motion for appropriate relief for newly discovered evidence in the Court of Appeals was denied where there was no reasonable possibility of a different result, the new evidence merely served to contradict, impeach or discredit other testimony, was not relevant, and there was no showing that it was not available at trial or at the hearing for the first motion for appropriate relief.

**8. Appeal and Error— motion for appropriate relief on appeal—prosecutorial misconduct**

Defendant's motion in the Court of Appeals for appropriate relief based upon prosecutorial misconduct was denied where it was based upon the same issue overruled in an assignment of error, and where the exculpatory evidence which allegedly should have been furnished to defendant was not of a nature to produce a different result, even if it was in the possession of the State.

Appeal by defendant from judgments entered 27 January 1998 and order entered 25 February 1998 by Judge Knox V. Jenkins, Jr. in Johnston County Superior Court. Heard in the Court of Appeals 23 August 1999.

*Attorney General Michael F. Easley, by Special Deputy Attorney General Jill Ledford Cheek, for the State.*

*Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defender Mark D. Montgomery, for defendant-appellant.*

WALKER, Judge.

Defendant was convicted of attempted first degree murder, first degree kidnapping, three counts of robbery with a dangerous weapon and two counts of second degree kidnapping. Defendant was sentenced to a minimum of 399 months and a maximum of 517 months in prison. Defendant filed a motion for appropriate relief in the trial court, which was denied. Defendant appeals both the convictions and the denial of the motion for appropriate relief.

The State's evidence tended to show the following: The Quality Finance Office in Johnston County near Goldsboro, North Carolina, was robbed at approximately 4:40 p.m. on 25 April 1997. Manager Charles Woodard, secretary Alice Wise, and a black customer named Bertha Miller were in the building at the time of the robbery. Two black males entered the office. The first black male, later identified as Kendrick Delon Henderson, wore a bandana over part of his face and was followed by a shorter black male with lighter skin, who was approximately five feet eight inches tall. The shorter black male's face was not covered during the robbery. Woodard identified the defendant as the shorter black male from a set of photographs furnished by law enforcement officers. At trial, Woodard and Wise both

identified the defendant as the shorter black male. Woodard and Wise testified they were face-to-face with the defendant for approximately twenty minutes. During this time, the defendant announced that a robbery was taking place and produced a revolver which he held to Woodard's head. He then forced the three victims into the back office, where Henderson bound the hands and feet of Wise and Miller with duct tape. The defendant demanded money from Woodard and Wise. Woodard gave the defendant money from the cash drawer, the safe, and from his pockets. The defendant asked for Wise's pocketbook, which was in the front office, and pulled her towards the front office. Wise was unable to move quickly because of her bound feet. Frustrated with Wise's slow pace, the defendant pushed Wise to the floor. As Wise was lying on the floor, face up, with her back against the wall, the defendant shot her in the chest. During this time, Wise was looking at the defendant. After the first shot, Wise raised her hands to protect her face. The defendant fired a second shot, which traveled through both of Wise's wrists and into her left eye. Wise testified that when the defendant shot her the second time, "I was looking directly in his face because I thought that was the last thing I was going to see." After being shot, Wise remained conscious until she was taken into the operating room for surgery. Wise permanently lost the use of her left eye.

Woodard's testimony corroborated Wise's version of the events of the robbery. Woodard testified that the two black males entered Quality Finance while Woodard, Wise, and Miller were all in the front office. The defendant held the revolver to Woodard's head and ordered all three victims to the back office where the hands and feet of Wise and Miller were bound by Henderson. The defendant took Woodard to the front office where Woodard showed the defendant the cash drawer. The defendant took the money from the cash drawer and escorted Woodard to the back office. During this time, Woodard was within three feet of the defendant as the revolver remained held to his head. After defendant demanded more money, Woodard gave defendant the money in the company safe located in the back office. Woodard then gave defendant the money in his pockets. Henderson bound Woodard's hands and legs with tape and took money from Miller's purse. The defendant then demanded money from Wise. When she indicated her purse was in the front office, defendant forced her to the front and out of the sight of Woodard. Woodard heard gun shots but did not see what happened in the front office. Woodard testified that the lighting in Quality Finance was very good.

Bertha Miller testified that during the robbery she was nervous, crying and shaking, and that Wise tried to calm her down. She did provide authorities with descriptions of the perpetrators but could not identify any of them from photographs, although she testified that she had previously known the defendant. After the robbery, Miller testified that through the window of Quality Finance she saw three individuals running to a car, but could not identify any of them. In other respects, her testimony corroborated that of Woodard and Wise.

After evidence was presented by the State and the defendant, Miller was recalled to the stand by the State. Miller testified that the person who bound her during the robbery had darker skin than the defendant but that person was not present in the courtroom.

Richard Keith Riddick testified for the State pursuant to a plea agreement arising out of his involvement in the robbery. Riddick stated that he waited in the car during the robbery and that Henderson and the defendant committed the robbery. Riddick testified that while he waited he heard three gun shots, after which Henderson first came running out to the car. The defendant ran out a few seconds later carrying a revolver and a bag containing money. On direct examination Riddick denied having a cousin named Terence.

The defendant testified and denied any involvement in the robbery and stated that he was playing softball near his home at the time of the robbery. Defendant offered the testimony of his grandmother, step-grandfather, and a family friend, all of whom confirmed his testimony.

Henderson testified for the defendant and admitted his presence at the scene of the robbery. Henderson was also charged and his fingerprints were identified on the duct tape left at the scene. Henderson stated that Riddick and Riddick's cousin, who was also named "Terence," went inside Quality Finance. Henderson testified that he was in the car and thought that Riddick and Riddick's cousin entered Quality Finance to obtain a loan. After a few minutes passed, Henderson entered the office. Henderson testified that upon discovering a robbery in progress, he returned to the car. Henderson stated that he did not know the defendant and that defendant was not involved in the robbery.

After defendant's conviction, Henderson reiterated to Detective Bobby Braswell, of the Wayne County Sheriff's Department, that defendant did not commit the robbery. Henderson told Detective

Braswell that Riddick's cousin, named Terence, was one of the perpetrators. Based on this information, Detective Braswell located Riddick's cousin, whose name was Terence DeLoach. Detective Braswell then questioned DeLoach and his girlfriend, Kim Robinson, regarding the Quality Finance robbery. Wayne County authorities told DeLoach that if he or Robinson were withholding information, the Department of Social Services would be contacted about Robinson and her small child and that she might be evicted from her apartment. DeLoach subsequently admitted he was involved in the robbery and that he shot Wise. Wayne County authorities transported DeLoach to Johnston County authorities for questioning and DeLoach again confessed to the crime. However, DeLoach's details of the events were inconsistent with the testimony of the three victims. When State Bureau of Investigation Agent Greg Tart pointed out to DeLoach numerous inconsistencies, DeLoach recanted and said, "Man, you-all got the right man. Garner did it. I made up the whole story when I told them down in Wayne County." DeLoach stated the reason for his original confession was the result of threats by the Wayne County officers to "get Kim [Robinson] evicted from her apartment and Social Services would take away her child."

Defendant filed a motion for appropriate relief in the trial court pursuant to N.C. Gen. Stat. § 15A-1415(c) based on newly discovered evidence and perjured testimony at his trial. In support of his motion, defendant called DeLoach and Riddick; however, both refused to testify based on their Fifth Amendment privilege. Defendant called Henderson who testified that DeLoach was the Quality Finance gunman. Defendant then called State Bureau of Investigation Agent Mike East who testified regarding an out-of-court statement made by Riddick one week after defendant's trial. Agent East testified that: Riddick admitted that he has a cousin named Terence; defendant, Henderson, DeLoach, and Riddick were all involved in the robbery; defendant shot Wise but DeLoach did not enter the Quality Finance building; Riddick then changed his statement and accused DeLoach of shooting Wise.

In response, the State offered Woodard and Wise, who again identified defendant as the gunman and both stated that they had never seen DeLoach before this hearing. Psychiatrist Nicole Wolfe examined DeLoach in preparation for the hearing and testified that his I.Q. was 76 and he was prone to impulsive behaviors that made him capable of admitting to something he did not do. Specifically, that it was possible that DeLoach would confess to a crime he did not com-

**STATE v. GARNER**

[136 N.C. App. 1 (1999)]

mit after being threatened that his girlfriend's child would be taken away if he did not confess to the crime.

After hearing testimony, receiving certain exhibits and hearing arguments of counsel over the course of three days, the trial court denied defendant's motion to dismiss the charges or for a new trial. In denying the motion for appropriate relief, the trial court made extensive findings and concluded the following: (1) that the defendant failed to prove by a preponderance of the evidence that he is entitled to a new trial under the provisions of North Carolina General Statute § 15A-1420(c)(5); and (2) that the defendant failed to prove by a preponderance of the evidence that had the false testimony of Riddick not been admitted, a different result would have been reached at the trial.

I.

[1] We first address the defendant's contention that the trial court erred in denying his motion for funds to appoint an eyewitness identification expert. Prior to trial, the defendant asked the trial court for funds to hire an eyewitness identification expert who could have testified that imperfections in memories are especially prevalent in situations of high stress.

The defendant moved for an *ex parte* hearing on his motion for funds to hire the expert. Instead, the trial court heard from the State and the defendant regarding this request and denied defendant's motion finding that "an identification expert is not essential to the defense."

To first establish a threshold showing of need for expert assistance, a defendant must prove that "(1) he will be deprived of a fair trial without the expert assistance, or (2) there is a reasonable likelihood that the expert assistance will materially assist him in the preparation of his case." *State v. Coffey*, 326 N.C. 268, 284, 389 S.E.2d 48, 58 (1990). In determining whether a defendant has made the requisite showing of a particularized need, the court "should consider all the facts and circumstances known to it at the time the motion for . . . assistance is made." *State v. Gambrell*, 318 N.C. 249, 256, 347 S.E.2d 390, 394 (1986). The showing demanded is flexible and is to be resolved on a case-by-case basis and not by a bright-line rule. *State v. Moore*, 321 N.C. 327, 364 S.E.2d 648 (1988). The "mere hope or suspicion of the availability of certain evidence that might erode the State's case or buttress a defense will not suffice to satisfy the requirement

that defendant demonstrate a threshold showing of specific necessity for expert assistance." *State v. Tucker*, 329 N.C. 709, 719-20, 407 S.E.2d 805, 811-12 (1991). Similarly, undeveloped assertions that the requested expert assistance would be beneficial or even essential to the preparing of an adequate defense are insufficient to satisfy this threshold requirement. *State v. Moseley*, 338 N.C. 1, 20-21, 449 S.E.2d 412, 425 (1994).

In *State v. Abraham*, 338 N.C. 315, 451 S.E.2d 131 (1994), our Supreme Court upheld the trial court's denial of the defendant's motion for an eyewitness identification expert. Defendant's motion was based on the need to show the unreliability of witness identifications of the defendant. *Id.* at 348, 451 S.E.2d at 148. The Court rejected defendant's argument because of the strength of the identifications and because an expert would have only testified to matters within the common understanding of the jury. *Id.* The Court declined to address defendant's argument that an expert would also provide specialized knowledge outside the common understanding of the jury, since that argument had not been made to the trial court. *Id.* at 349, 451 S.E.2d at 149. The Court found that defendant's showing to the trial court failed to demonstrate a particularized need for an expert. *Id.*

On appeal, the defendant contends that under the circumstances of this case, distortions in memories are common when the identification of a defendant is at issue and that cross-racial identification is highly unreliable. Defendant asserts that this meets the threshold showing required of him. However, our review of the record establishes that the defendant has failed to make the threshold showing as required by *Coffey*. Therefore, the trial court did not abuse its discretion in denying defendant's motion for funds to employ an eyewitness identification expert.

[2] Defendant also argues the trial court erred in failing to grant his request for an *ex parte* hearing on his motion. Defendant claims this denial required him to reveal his theory of defense to the State. Our Courts have allowed *ex parte* hearings regarding requests for funds to employ an expert in limited circumstances. In *State v. Phipps*, 331 N.C. 427, 418 S.E.2d 178 (1992), our Supreme Court considered whether a defendant's rights to due process, to effective assistance of counsel, and to reliable sentencing in a capital murder trial mandated that his motion for funds to employ a fingerprint expert be heard *ex parte*. The Supreme Court noted that the defendant's "right to obtain

[the expert] assistance [necessary to assist in preparing his defense] without losing the opportunity to prepare the defense in secret" was a strong reason for conducting an *ex parte* hearing. *Id.* at 449, 418 S.E.2d at 189 (*quoting Brooks v. State*, 259 Ga. 562, 565, 385 S.E.2d 81, 84 (1989)). The *Phipps* Court held the defendant was not entitled to an *ex parte* hearing nor was he entitled to funds to employ a fingerprint expert. The Court went on to state that "[w]hereas an indigent defendant's access to the 'basic tools of an adequate defense' is a core requirement of a fundamentally fair trial, the need for an *ex parte* hearing on a motion for expert assistance is not." *Id.* at 450, 418 S.E.2d at 190.

On the other hand, our Supreme Court in *State v. Ballard*, 333 N.C. 515, 428 S.E.2d 178 (1993) held that the trial court is constitutionally required to grant an indigent defendant an *ex parte* hearing to establish the need for a psychiatric expert. In holding that the defendant was entitled to an *ex parte* hearing, our Supreme Court stated:

> That the defendant in *Phipps* was requesting an *ex parte* hearing in order to apply for funds for a fingerprint expert distinguishes that case critically from the case now before us. The key difference between a hearing on the question of an indigent defendant's right to a fingerprint expert and one on the question of his right to a psychiatric expert is that the object of adversarial scrutiny is not mere physical evidence, but the defendant himself. The matter is not tactile and objective, but one of an intensely sensitive, personal nature. [. . .] Moreover, because the area of psychiatric expertise differs importantly from that of fingerprint analysis, defendant's constitutional rights are far less likely to be jeopardized by the presence of the prosecutor when defendant attempts a threshold showing for a fingerprint expert than when he offers evidence to support his need for a psychiatrist.

*Id.* at 519, 428 S.E.2d at 180-81.

We find instructive the *Ballard* Court's distinction between the request for a psychiatric expert from the request for a fingerprint expert. For similar reasons, we find a request for an eyewitness identification expert does not require the constitutional protections afforded the request for a psychiatric expert. *See State v. White*, 340 N.C. 264, 277, 457 S.E.2d 841, 849 (1995) (holding that an indigent defendant's request for an investigator is not entitled to an *ex parte* hearing because an investigator is more analogous to a fingerprint expert than a psychiatric expert). The physical evidence, not the

STATE v. GARNER

[136 N.C. App. 1 (1999)]

defendant, is the "object of adversarial scrutiny" in a hearing for an eyewitness identification expert. An eyewitness identification expert is offered to undermine the reliability of the testimonial identification of the defendant, whereas the absence of a psychiatric expert puts at risk the availability of an insanity or diminished capacity defense strategy. Finding *Phipps* controlling, the decision to deny an *ex parte* hearing was within the trial court's discretion. *Phipps*, 331 N.C. at 449, 418 S.E.2d at 190. Since the defendant is unable to establish a threshold showing of a need for an expert, there was no prejudice in the trial court's denial of an *ex parte* hearing. *White*, 340 N.C. at 277, 457 S.E.2d at 849.

## II.

**[3]** The defendant next assigns as error the trial court's denial of his motion to suppress the identification testimony of Woodard and Wise. Defendant argues that the pre-trial as well as the in-court identifications of both Woodard and Wise should have been suppressed because Woodard and Wise suffered mental and physical trauma during the robbery.

Specifically, defendant contends that Woodard's out-of-court identification is unreliable because there was no evidence that he was wearing glasses at the time of the crime. Woodard testified that he wore his glasses at the time he made the identification of the defendant in the photographic line-up. Defendant alleges the trial court failed to make findings regarding Woodard's ability to see clearly during the robbery. Defendant next argues that Wise's identification of the defendant at his bond hearing was unfairly suggestive because defendant was dressed in prison clothes and shackled. Defendant further contends that since both Woodard and Wise are white and the gunman was black, the cross-racial identification by these witnesses is unreliable.

The trial court conducted a *voir dire* hearing regarding the admissibility of Wise's identification. She testified to the following: (1) the defendant's face was not covered; (2) she was face-to-face with defendant when he pulled her to the front of the office to get her purse; (3) she was looking directly at the defendant when he shot her in the head; (4) her vision was good before the shooting; (5) there was adequate lighting in the office; (6) she was observing the defendant for the majority of the twenty minutes he was there; (7) she was calm throughout the robbery; and (8) she was "positive" that the defendant was the gunman.

STATE v. GARNER

[136 N.C. App. 1 (1999)]

Regarding her out-of-court identification of defendant at a bond hearing, Wise stated that she voluntarily attended the bond hearing where she saw five or six individuals in orange jumpsuits. In this group, she recognized two individuals: the defendant as the gunman and Henderson. Then she related this to the district attorney. Based on Wise's testimony, the trial court found her in-court identification was "unequivocal" and that her out-of-court identification was not so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification. The trial court concluded that Wise's in-court identification was of independent origin and denied defendant's motion to suppress her identification of the defendant.

Woodard testified at trial that the defendant's face was uncovered during the robbery, he was within a foot of defendant's face for the majority of twenty minutes, and the lighting in Quality Finance was good. Woodard testified at the *voir dire* hearing that after viewing an array of photographs for approximately two minutes while wearing his glasses, he made an identification of the defendant. In court, Woodard also identified the defendant and stated there was absolutely no doubt that defendant was the gunman. Defendant did not question Woodard about his ability to see during the robbery. The trial court found Woodard's testimony to be "forthright and unequivocal," his recollection was "detailed" and that he was "in full control of his mental faculties throughout the ordeal." The trial court then denied defendant's motion to suppress Woodard's out-of-court and in-court identifications of defendant.

Identification evidence must be suppressed on due process grounds where the facts show that the pre-trial identification procedure was so suggestive as to create a very substantial likelihood of irreparable misidentification. *State v. Simpson,* 327 N.C. 178, 186, 393 S.E.2d 771, 776 (1990) (citations omitted). The test for determining the existence of irreparable misidentification includes several factors: (1) the opportunity of the witness to view the perpetrator at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the perpetrator; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *State v. Breeze,* 130 N.C. App. 344, 350, 503 S.E.2d 141, 145-146, *disc. rev. denied,* 349 N.C. 532, 526 S.E.2d 471 (1998). In other words, a suggestive identification procedure has to be unreliable under a totality of the circumstances in order to be inadmissible. *Id.* Even when a pretrial procedure is found to be unreliable, in-court identification of

independent origin is admissible. *State v. Headen*, 295 N.C. 437, 439, 245 S.E.2d 706, 708 (1978).

For the majority of twenty minutes, Wise was in the presence of the defendant and was face-to-face with him as he pulled her to the front office. Wise was calm throughout the robbery and was looking at defendant's face when he shot her. She identified the defendant while in attendance at his bond hearing and again identified defendant at trial.

Woodard was within three feet of the gunman for the majority of twenty minutes. Woodard testified he was in control of his emotions and clearly recalled the events of the robbery. When presented with a photographic line-up one week after the event, Woodard promptly identified the defendant. In court, Woodard again identified the defendant without hesitation.

Under a totality of the circumstances, there was no substantial likelihood of irreparable misidentification by either Woodard or Wise. The out-of-court and in-court identifications of Woodard and Wise were not impermissibly suggestive and the trial court did not err in their admission.

### III.

[4] Defendant next contends that the trial court's denial of his motion for appropriate relief was error. Defendant argues that DeLoach's confession is newly discovered evidence and, together with Riddick's recanted testimony, a new trial is warranted pursuant to N.C. Gen. Stat. § 15A-1415(c).

At the motion for appropriate relief hearing, DeLoach took the stand and invoked his Fifth Amendment rights. Both Woodard and Wise were in court when DeLoach was on the stand. Both later testified that DeLoach was not the gunman who shot Wise.

At the conclusion of the hearing, the trial court made the following findings regarding DeLoach's confession:

(1) DeLoach was diagnosed by Dr. Nicole Wolfe with borderline intelligence, anti-social and impulsive disorders and described as a person who acts without thinking.

(2) The statement given the Wayne County Deputies by DeLoach was repeated later to Special Agent Tart of the North Carolina

**STATE v. GARNER**

[136 N.C. App. 1 (1999)]

State Bureau of Investigation who was an investigating officer and knew the details of the shooting of Alice Wise. When confronted with details that were not consistent with actual facts, DeLoach recanted. DeLoach gave his reason for his original statement as being the result of threats by the Wayne County officers, quote, "To get Kim evicted from her apartment and social services would take away her child," end quote, State's MAR-1, page seven. DeLoach stated in his recantation that Garner was in fact involved in the robbery and shooting at the finance company, State's MAR-1, page six.

(3) The inculpatory statements given the Wayne County Deputies and the Johnston County Deputies must be considered with the exculpatory statement given Special Agent Tart in determining whether the original statements are, quote, "probably true," end quote.

(4) The defendant has failed to prove by a preponderance of the evidence that the aforesaid statements given by DeLoach are probably true.

(5) The statements given by DeLoach do tend to contradict, impeach or discredit the testimony of the witnesses Wise, Woodard, Riddick and in the recantation, the defendant Garner.

To establish that DeLoach's confession constitutes newly discovered evidence that warrants a new trial, the defendant must show that: (1) the witness or witnesses will give newly discovered evidence; (2) the newly discovered evidence is probably true; (3) the evidence is material, competent and relevant; (4) due diligence was used and proper means were employed to procure the testimony at trial; (5) the newly discovered evidence is not merely cumulative or corroborative; (6) the newly discovered evidence does not merely tend to contradict, impeach or discredit the testimony of a former witness, and (7) the evidence is of such a nature that a different result will probably be reached at a new trial. *State v. Britt*, 320 N.C. 705, 712-13, 360 S.E.2d 660, 664 (1987). In an evidentiary hearing, defendant bears the burden of proving by a preponderance of the evidence every fact essential to support the motion. N.C. Gen. Stat. § 15A-1420(c)(5) (1997). If the findings are based upon competent evidence, those findings are binding on appeal, even if the evidence at the hearing is conflicting. *State v. Carter*, 66 N.C. App. 21, 25, 311 S.E.2d 5, 8 (1984).

The trial court is in the best position to judge the credibility of a witness. Here, the trial court found that the defendant failed to prove that DeLoach's statements given to the authorities were probably true. Based on competent evidence taken at the motion hearing, the findings by the trial court regarding DeLoach's confession are binding on appeal. *State v. Harding*, 110 N.C. App. 155, 165, 429 S.E.2d 416, 423 (1993). Adopting the findings of the trial court, we conclude the trial court did not abuse its discretion in denying defendant's motion with regard to DeLoach's confession.

[5] Defendant also argues that a new trial was justified based on Riddick recanting his trial testimony and that the trial court erred in finding only that Riddick's testimony was false in regard to his having a cousin named Terence. Like DeLoach, Riddick also invoked his Fifth Amendment rights and declined to testify. In its findings, the trial court noted that, at trial, the jury was instructed to closely examine Riddick's testimony since he had entered into a plea agreement with the State in exchange for his testimony. The trial court further found:

> (2) Riddick testified that he did not have a cousin named Terence. This was false testimony. Riddick was a material witness.

> (3) Considering all of the testimony implicating the defendant as the gunman and participation in the robbery there is lacking even a remote possibility that had Riddick testified truthfully concerning a cousin named Terence, a different result would have been reached at the trial. This testimony fails to meet the second criteria or requirement that there is a reasonable possibility that had the false testimony not been admitted, a different result would have been reached at trial.

> (4) The fact that Riddick lied about having a cousin named Terence did not have a direct and material bearing upon the defendant's guilt or innocence.

Riddick testified at trial that he did not have a cousin named Terence. Testimony by witnesses at the motion hearing established that Terence DeLoach is in fact Riddick's cousin. This formed the basis for the trial court's finding that Riddick gave false testimony when he denied having a cousin named Terence. The only suggestion that Riddick's testimony implicating the defendant was false was

Riddick's recantation, which served as his third version of the events of the robbery.

A new trial based upon recanted testimony may be granted if the trial court is "reasonably well satisfied that the testimony of a material witness was false, and there is a reasonable possibility that, had the false testimony not been admitted, a different result would have been reached at trial." *Britt*, 320 at 715, 360 S.E.2d at 665. Our Supreme Court has held:

> [t]here is a difference between recanted testimony and newly discovered evidence. Newly discovered evidence is evidence which was in existence but not known to a party at the time of trial. Recanted testimony is testimony which has been repudiated by a party who gave it. Recanted testimony is not evidence which existed at the time of trial because the recanting witness would not have testified to it at trial. A motion for a new trial on the basis of recanted testimony is for the purpose of removing testimony from a jury. A motion for a new trial based on newly discovered evidence is for the purpose of putting new evidence before a jury.

*State v. Nickerson*, 320 N.C. 603, 609, 359 S.E.2d 760, 763 (1987). With regard to recanted testimony, "[it] is exceedingly unreliable, and it is the duty of the trial court to deny the motion for new trial where it is not satisfied that such testimony is true, especially where the recantation involves a confession of perjury or where there is a repudiation of the recantation." *State v. Shelton*, 21 N.C. App. 662, 665, 205 S.E.2d 316, 318 (1974).

Riddick's post-conviction out-of-court statements contain conflicting versions of the Quality Finance robbery. Riddick initially stated that he, the defendant, Henderson, and DeLoach participated in the robbery and that defendant shot Wise. Riddick gave yet another version in which he stated defendant did not participate in the robbery and that DeLoach shot Wise.

The testimonies of Woodard and Wise at the hearing were consistent with their testimonies at trial and both again made a positive identification of the defendant as the gunman. In light of this eyewitness testimony implicating defendant as the gunman, the trial court concluded that even if Riddick's trial testimony were excluded, there was not a reasonable possibility that a different result would have been reached at trial.

**[6]** Defendant further argues that the State knew or should have known that Riddick would give false testimony and that the State's use of false testimony merits a new trial. Defendant gives two reasons why the State should have known Riddick would perjure himself: (1) Riddick was testifying pursuant to a plea agreement and (2) Riddick's pre-trial polygraph test indicated that his answers were deceptive. On the other hand, the State points out that Riddick testified at trial that the defendant was involved in the robbery and that he said in his initial statement to law enforcement after trial that defendant and DeLoach both were involved. Therefore, implicit in the trial court's order was that Riddick's testimony was not probably false except in regard to his having a cousin named Terence.

Defendant's contentions are without merit. The defendant has failed to establish that Riddick, in his out-of-court statements, perjured himself at trial, except to the extent that his testimony was false with regard to his having a cousin named Terence.

The trial court's findings are based upon competent evidence and therefore binding on appeal. *See Harding*, 110 N.C. App. at 165, 429 S.E.2d at 423 (stating that upon review of an order entered on a motion for appropriate relief, "the findings of fact are binding if they are supported by any competent evidence, and the trial court's ruling on the facts may be disturbed only when there has been a manifest abuse of discretion, or when it is based on an error of law"). The trial court applied the appropriate standard to a motion for appropriate relief and the conclusions based upon the findings were not an abuse of discretion. Our decision is in accord with case law concerning newly discovered evidence based upon confessions and recantations. *See State v. Eason*, 328 N.C. 409, 402 S.E.2d 809 (1991) (holding denial of motion for appropriate relief was proper where defendant could not show that third party's confession and recantation would constitute newly discovered evidence since confession was unreliable and included inconsistent details and recantation and continuing denial of involvement by third party meant there would be no new evidence at trial); *State v. Hoots*, 76 N.C. App. 616, 334 S.E.2d 74 (1985) (affirming denial of motion for appropriate relief where co-defendant's confession exonerating defendant was unreliable and unconvincing in light of co-defendant's recantation and lack of trustworthiness); *State v. Carter*, 66 N.C. App. 21, 311 S.E.2d 5 (1984) (affirming denial of motion for appropriate relief where third party's confessions to cell mates that he acted alone, thereby exonerating defendant, coupled with recantation did not constitute newly discovered evidence).

Defendant's motion for a new trial based on Riddick's recantation of his trial testimony was properly denied. The trial court did not err in denying defendant's motion for appropriate relief.

## IV.

[7] On 12 July 1999, defendant filed with this Court a second motion for appropriate relief which was amended and re-filed on 4 October 1999. Defendant argues that additional newly discovered evidence since the first motion hearing merits a new trial and that prosecutorial misconduct tainted the conviction, also warranting a new trial. Pursuant to N.C. Gen. Stat. § 15A-1418(b):

> When a motion for appropriate relief is made in the appellate division, the appellate court must decide whether the motion may be determined on the basis of the materials before it, or whether it is necessary to remand the case to the trial division for taking evidence or conducting other proceedings. If the appellate court does not remand the case for proceedings on the motion, it may determine the motion in conjunction with the appeal and enter its ruling on the motion with its determination of the case.

N.C. Gen. Stat. § 15A-1418(b) (1997).

Ordinarily, issues regarding newly discovered evidence are heard in the trial court. However, since the record on appeal and defendant's affidavits attached to his second motion for appropriate relief are now before this Court, we elect, pursuant to N.C. Gen. Stat. § 15A-1418(b), to address the motion concurrently with defendant's appeal.

Defendant contends that affidavits given after the first motion hearing by Bertha Miller and Peter Benjamin Wright constitute newly discovered evidence. Miller was the third person present at Quality Finance when the robbery occurred and she testified at trial. While awaiting trial of defendant, Wright was a cell mate of Riddick in the Johnston County Jail.

Miller's affidavit, given 4 August 1998, in part provides the following:

> 8. I have known Terence Garner for many years. If he participated in the robbery, I would have been able to recognize him— even at a glance. I never pointed at Terence Garner in any of the line-ups and said that he was involved in the robbery.

9. Terence Garner was not inside the Quality Finance on the day of the robbery. I was too scared to look at the robber without the mask for any significant time because I feared for my life. However, I was able to glance at the robber without a mask a couple of times and I know that his face is not the same as Terence Garner.

10. Terence Garner was not the black male without the mask in the Quality Finance. I cannot, to my own knowledge, tell you who was outside of the Quality Finance. When I looked out of the window on the day of the robbery, I only saw the backs of three black males running.

11. I knew, from the time I was shown the first line-up, that Terence Garner was not inside the Quality Finance during the robbery. I did not come out and say so on the witness stand because I did not want Mr. Woodard and Ms. Wise to be mad at me.

After the defendant's trial had concluded, Detective Jason Barbour of the Johnston County Sheriff's Department showed Miller a photographic line-up regarding the Quality Finance robbery. Miller's affidavit states:

13. I viewed that line-up for a significant amount of time. I noticed that one of the faces, particularly the eyes, looked like one of the black males that I saw in the Quality Finance on the day of the robbery. After I pointed that face out and said there was "something about him," the detective told me that he was the person they picked up for the robbery, Terence DeLoach. The officers asked me if I was certain that I recognized that person. Eventually, I said that I could not be certain that he was one of the robbers.

On 5 February 1998, after Detective Barbour showed Miller a line-up, she was shown another photographic line-up by Investigative Assistant Scott Kendrick of the District Attorney's Office. With regard to that line-up, Miller's affidavit states:

14. At a later time, an African American officer picked me up at work in his black Cherokee. This officer took me to the police station. While I was there, he arranged four photographs for me to view. The photos were of the four men that they had arrested for the Quality Finance robbery (Garner, Riddick, DeLoach, Henderson). I looked at the photographs and told the officers that

Terence Garner was not involved in the robbery of the Quality Finance. The officer asked me if I was sure, and I told him that I was sure that Terence Garner, the person that I saw in the picture, was not involved in the robbery.

As part of its response to the defendant's second motion for appropriate relief, the State submits Kendrick's affidavit to rebut Miller's claims which, in part, provides the following:

6. When we arrived at the District Attorney's office, I took [Miller] into the small conference room adjacent to [the District Attorney's] personal office. We were alone in the room. I showed her the four photographs of Garner, Henderson, Riddick and DeLoach. She stated that she recognized Garner, but did not know Henderson or Riddick, and when she looked at DeLoach's photograph, she said "there is something about his eyes." I asked her it [sic] she could recognize any of these four individuals as having been present during the robbery, and she replied that she could not.

. . .

10. I was alone with Ms. Miller during the entire interview. Near the end of the interview, I asked her directly if Terence Garner was present during the robbery. She hesitated, and then replied, "I can't say." Ms. Miller never told me that Garner was not inside Quality Finance during the robbery or that he was not involved in the robbery.

The rule, as previously stated, requires a defendant to prove beyond a preponderance of the evidence that (1) the witness will give newly discovered evidence; (2) the newly discovered evidence is probably true; (3) the evidence is material, competent and relevant; (4) due diligence was used and proper means were employed to procure the testimony at trial; (5) the newly discovered evidence is not merely cumulative or corroborative; (6) the newly discovered evidence does not merely tend to contradict, impeach or discredit the testimony of a former witness, and (7) the evidence is of such a nature that a different result will probably be reached at a new trial. *Britt*, 320 N.C. at 712-13, 360 S.E.2d at 664.

Miller testified at trial that she was unable to identify either person inside Quality Finance during the robbery. Miller remains unable to positively identify any of the men involved in the robbery. Her affidavit does corroborate Henderson's trial testimony that defendant

STATE v. GARNER

[136 N.C. App. 1 (1999)]

was not involved in the robbery. However, the evidence at trial showed that during the robbery, Miller was nervous, crying and shaking, and Wise tried to calm her down. On the other hand, the trial court found that Woodard was in control of his emotions during the event and has a clear recall of the actions of the individuals who committed the robbery. Further, Wise was in control of her emotions until the moment she was shot and her ability to see, hear and know of the events about which she testified was uncontradicted.

Even conceding defendant's argument that Miller's affidavit constitutes newly discovered evidence to the extent she now states that the defendant was not present in the office when the robbery occurred, her evidence merely serves to impeach and contradict the identification testimony of Woodard and Wise and is not of "such a nature that a different result will probably be reached at a new trial" given the strength of the two eyewitness identifications. *See Britt*, 320 N.C. at 712-13, 360 S.E.2d at 664.

Further, assuming that Miller, by her affidavit, has recanted her trial testimony, we fail to see a reasonable possibility that the exclusion of Miller's testimony would effect a different result at trial. *See Britt*, 320 N.C. at 715, 360 S.E.2d at 665.

Defendant states three additional contentions for finding that newly discovered evidence exists such that a new trial is warranted. We discuss each in turn.

First, defendant argues that the affidavit of Wright constitutes newly discovered evidence. Wright's affidavit states that Riddick told him that he (Riddick) planned to commit perjury at defendant's trial in order to secure a favorable plea agreement. Wright also says that he and Riddick agreed not to tell anyone about Riddick's plan until after he was sentenced pursuant to his plea agreement. At his hearing, defendant subpoenaed Wright to testify regarding Riddick's plan to commit perjury. Wright refused to testify at the first motion hearing for the reason that Riddick had not yet been sentenced. Defendant asserts that Wright is now willing to testify as to his conversations with Riddick while they were cell mates. Defendant contends that "Wright was not legally available to testify either at trial or at the [motion] hearing."

Second, defendant contends there is newly discovered evidence in the affidavit of Wayne County Detective Jerry Best that relates to the post-conviction investigation by the Johnston County authorities.

Specifically, the affidavit describes the investigation procedure employed in locating and arresting the defendant. Further, Best's affidavit refers to the reaction of the district attorney upon hearing of DeLoach's confession, the decision by Johnston County authorities not to jointly interrogate DeLoach with Wayne County authorities, and Best's professional opinion concerning the length of time Woodard looked at the photographic line-up before identifying the defendant.

Third, defendant argues that he has obtained since the first motion hearing newly discovered evidence in the form of two affidavits from experts in eyewitness identification and forensic psychiatry who will testify on behalf of defendant. The testimony of these two witnesses would rebut the expert testimony of Nicole Wolfe regarding DeLoach's confession and recantation. At defendant's first motion hearing, defendant did not request funds to employ a forensic psychiatrist nor renew his request for funds to employ an identification expert.

The State contends that pursuant to N.C. Gen. Stat. § 15A-1419(a)(1), defendant is procedurally barred from raising these issues in his second motion. N.C. Gen. Stat. § 15A-1419(a)(1) states the following as a ground for the denial of a motion for appropriate relief:

> Upon a previous motion made pursuant to this Article, the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so. This subdivision does not apply when the previous motion was made within 10 days after entry of judgment or the previous motion was made during the pendency of the direct appeal.

N.C. Gen. Stat. § 15A-1419(a)(1) (1997).

Defendant's first motion for appropriate relief was filed within 10 days of judgment and thus the grounds raised in the present motion are not procedurally barred. However, the defendant's three contentions of newly discovered evidence are still subject to the *Britt* requirements that (1) the witness will give newly discovered evidence; (2) the newly discovered evidence is probably true; (3) the evidence is material, competent and relevant; (4) due diligence was used and proper means were employed to procure the testimony at trial; (5) the newly discovered evidence is not merely cumulative or corroborative; (6) the newly discovered evidence does not merely tend

to contradict, impeach or discredit the testimony of a former witness, and (7) the evidence is of such a nature that a different result will probably be reached at a new trial. *Britt*, 320 N.C. at 712-13, 360 S.E.2d at 664.

Wright's affidavit merely serves to contradict, impeach or discredit the testimony of Riddick, Woodard and Wise. Furthermore, Wright's affidavit establishes that defendant was aware prior to the first motion hearing that Wright knew of Riddick's plan to commit perjury. However, defendant did not ask the trial court to declare Wright unavailable and consider his affidavit instead.

With regard to the affidavit of Detective Best, we fail to see how the evidence proffered is material or relevant. Additionally, defendant makes no showing that this evidence was not available at trial or at the first motion hearing. Also, Detective Best was called by the defendant and testified at the first motion hearing. Finally, the evidence proffered by the Wright and Best affidavits when applied to the requirements of *Britt* is not of such a nature that a different result will probably be reached at a new trial.

Defendant fails to establish how the experts' opinions constitute newly discovered evidence. Additionally, defendant states in his motion that the testimony of one expert "would rebut the State's expert testimony" and that "the jury would likely (and properly) lose confidence in the accuracy of Ms. Wise and Mr. Woodard." As defendant argues, the testimony would tend to contradict, impeach and discredit the testimony of former witnesses. Again, applying the *Britt* requirements the defendant has failed to prove that this evidence warrants a new trial. Therefore, defendant's motion, with respect to his contentions based on newly discovered evidence, is denied.

[8] Defendant's second ground for relief is prosecutorial misconduct based on his claim that the State knew Riddick would give false testimony at trial and the State's withholding of exculpatory evidence given by Miller before the defendant's first motion hearing.

Defendant's argument that the State knew Riddick would give false testimony at trial is the same issue in an assignment of error in his appeal to this Court. For the reasons stated in overruling that assignment of error, the defendant's contentions are without merit.

Additionally, we note that the record on appeal reveals that at Riddick's sentencing hearing on 23 April 1998, Riddick related to the trial court yet another version of the events of the robbery.

Riddick stated under oath that he, the defendant, Henderson, and DeLoach were all involved in the robbery and that defendant was the gunman and DeLoach was the "look-out" outside Quality Finance. Further, he stated that his original trial testimony identifying the defendant as the gunman was truthful and he would be willing to testify again if asked.

Second, defendant argues that the information contained in Miller's affidavit is exculpatory evidence and should have been furnished to defendant before the first motion hearing.

At the first motion hearing, Detective Barbour testified for the State that after trial and after DeLoach's confession, he showed a photographic line-up separately to Woodard, Wise and Miller. Defendant did not question Detective Barbour about the line-up shown to Miller and did not call Miller to testify at the first motion hearing. Neither the defendant nor the State questioned Detective Barbour about whether Miller told Detective Barbour that defendant was present at the time of the robbery. Furthermore, Kendrick's affidavit regarding the photographic line-up he showed to Miller on 5 February 1998 states that she could not recognize any of the four individuals shown in the photographs as being present during the robbery.

In sum, we are unable to conclude that the State had "exculpatory evidence" in its possession. Further, again conceding defendant's argument that Miller's affidavit constitutes newly discovered evidence, based on the strength of the eyewitness identifications and the *Britt* requirements, the evidence is not of such a nature that a different result will probably be reached at a new trial. Defendant's second motion for appropriate relief is therefore denied.

We have carefully reviewed the remaining contentions in defendant's second motion for appropriate relief and find them to be without merit.

In conclusion, the defendant received a trial free of prejudicial error and the trial court did not err in denying his motion for appropriate relief. The defendant's second motion for appropriate relief filed in this Court is denied.

No error.

Chief Judge EAGLES and Judge McGEE concur.