IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA16-1290

 Filed: 7 November 2017

Alamance County, Nos. 12CRS057102, 12CRS057103

STATE OF NORTH CAROLINA

 v.

BRANDON MALONE, Defendant.

 Appeal by Defendant from judgments entered 7 April 2016 by Judge James K.

Roberson in Alamance County Superior Court. Heard in the Court of Appeals 7

September 2017.

 Attorney General Joshua H. Stein, by Assistant Attorney General Jess D.
 Mekeel, for the State.

 Office of the Appellate Defender, by Assistant Appellate Defender Paul M. Green
 and Appellate Defender Glenn Gerding, for defendant-appellant.

 HUNTER, JR., Robert N., Judge.

 Brandon Malone (“Defendant”) appeals following a jury verdict convicting him

of first-degree murder and assault with a deadly weapon with intent to kill inflicting

serious injury. Following the verdicts, the trial court imposed concurrent sentences

of life imprisonment without parole for murder and 83 to 112 months imprisonment

for assault. On appeal, Defendant contends the trial court erred in allowing

eyewitness testimony in violation of the North Carolina Eyewitness Identification
 STATE V. MALONE

 Opinion of the Court

Reform Act of 2007 (“EIRA”) and due process of law. After review we find the court

erred to the prejudice of Defendant and order a new trial.

 I. Factual and Procedural Background

 On 5 November 2012, an Alamance County Grand Jury indicted Defendant for

first-degree murder and assault with a deadly weapon with intent to kill inflicting

serious injury. On 12 March 2016, Defendant filed a written motion to suppress

eyewitness identification evidence. In his written motion, Defendant argued the

State subjected two eyewitnesses, Claudia Lopez and Cindy Alvarez, to an

impermissibly suggestive identification procedure when they were “put in a location

where [Defendant] could not see [them] and asked to watch him walk from the

transport vehicle to the [c]ourthouse for hearings in his case. He was handcuffed and

alone, with no co-defendants or other prisoners and he was dressed in a jail jumpsuit.”

Defendant contends this constituted an impermissible, single-person show-up of

Defendant. Therefore, Defendant argued their in-court identification of Defendant,

as well as any discussion of what occurred during the show-up, should be suppressed

as irreparably tainted. On 14 March 2016, the Alamance County Superior Court

called Defendant’s case for trial and began a voir dire hearing on Defendant’s pre-

trial motion to suppress.

 In defense of the motion the State called Claudia Salas Lopez. Lopez is an

eyewitness to the murder of Kevette Jones. On 23 October 2012, Lopez sat on the

 -2-
 STATE V. MALONE

 Opinion of the Court

front porch of Jones’s house, approximately ten feet away him, when he was shot.

While on the stand, she recalled two men were involved in the shooting. The shooter

wore a white t-shirt, had shoulder length hair, and exited the passenger side of a blue

vehicle; the other man drove the vehicle, spoke to Jones, and had an eyebrow piercing.

 The day after the shooting Lopez gave the following description of the two men

to detectives. She stated one of the black males is tall with braids and wore a hat,

and the other man is shorter, but she could not then remember any of his

distinguishing features. She told the detectives one of the men had his hand in his

pocket, but she could not remember which one. She testified when she first spoke to

the detectives she was in a state of shock from having witnessed her good friend get

shot.

 During a second interview on 25 October, Lopez stated one of the men wore

dark pants, a black and white plaid shirt, and had shoulder length dreadlocks. The

only description she gave of the second suspect was he had shorter hair. Lopez

further testified “I never really paid much attention to [Defendant’s] face because the

whole time he was standing in front of us he just had his hand in his pocket.”

 On 25 October Detective Kevin King of the Burlington Police Department

prepared a photographic lineup for Lopez. He selected Defendant’s photograph from

the police department’s database, along with seven other subjects having the same

general description. The same day another officer administered the line-up to Lopez,

 -3-
 STATE V. MALONE

 Opinion of the Court

showing her each of the eight photographs one at a time. Upon viewing Defendant’s

photograph, Lopez did not identify him. However, when shown the eight photographs

a second time, Lopez paused on Defendant’s picture for a longer period of time than

the other pictures. She stated the picture looked like him, but she was not sure.

Because Lopez was not confident in her identification, the administering officer did

not consider her remarks to be a positive identification.

 The photograph of Defendant which was used in the line-up was taken

approximately a year and a half prior to the date of the offense. In the photo

Defendant had a hairstyle described as plats which were pulled back; however, a

more recent photograph showed Defendant’s hair in “dreadlocks that come down the

side.”

 Lopez had no further contact with anyone from the court system, including the

District Attorney’s office, for approximately three and a half years. Then, a few weeks

before trial Iris Smith, a legal assistant with the Alamance County District Attorney’s

office, contacted her to arrange a meeting in order to “talk about coming in to testify.”

Smith told Lopez a hearing related to this case would take place on 29 February 2016.

Lopez and Alvarez met Smith on that day and Smith showed them photographs of

Defendant and Marquis Spence―who had already been convicted for his role in the

shooting. Smith also showed them a surveillance video, taken from a security camera

outside a house on the street where the incident occurred; as well as part of

 -4-
 STATE V. MALONE

 Opinion of the Court

Defendant’s recorded interview with police officers.1 While they were watching

Defendant’s interview, Alvarez stood near a window and happened to see Defendant

exiting a police car. Alvarez directed Lopez’s attention outside, and Lopez also

watched Defendant exit the police car. He was wearing an orange jumpsuit, in

handcuffs, and escorted by an officer.

 Lopez stated her testimony regarding Jones’s shooting is based on her memory

of the events of 23 October 2012, and not on the photographs Smith showed her.

Lopez made an in-court identification of Defendant as the man who “shot the gun.”

This identification was the first time she positively identified Defendant as the

shooter.

 Next, the State called Cindy Alvarez. Alvarez testified she is also an

eyewitness to the shooting. She and Lopez were on the front porch of Jones’s house

when two men arrived in a blue car. Alvarez recalled the men began to ask Jones

questions and “one of the guys pulled out a gun and then just started shooting him.”

Alvarez was approximately four feet away from the shooter.

 When the police arrived, Alvarez gave officers a description of the two men

involved in the shooting. She stated one of the men wore a blue ball cap and the other

was quiet, had dark dreadlocks to his shoulders, and had dark freckles. She did not

know the heights of the men because she took off running as soon as the shooting

 1 During voir dire, none of the witnesses testified as to the contents of the surveillance video.

 -5-
 STATE V. MALONE

 Opinion of the Court

began. However, the same day she told an officer the shooter was taller than the

driver. When the Defense counsel questioned her regarding the relative heights of

the two men she stated “I don’t know how tall [either] of them are. I was on the top

of the front porch so . . . I was shaken up that day so I couldn’t really tell . . . who was

taller.” Alvarez conceded Defendant does not have dark freckles and she stated “I

wasn’t really paying attention like seeing if he had freckles or not. I was just . . . I

know it was him. I just remember I messed up on the freckles.”

 The day after the shooting officers showed Alvarez two different photo arrays.

In the first line-up she identified Spence, not Defendant, as the shooter. She stated

she was 80% sure photo number six, which was Spence, was the shooter, but she

would be 100% sure if he had long dreadlocks. On cross-examination defense counsel

asked Alvarez whether her identification of Spence as the shooter was “an accurate

portrayal of what happened,” to which Alvarez responded “I mean, yes. But at that

time when I did this, . . . I was shocked. . . . Like, it had just happened so I couldn’t

really . . . say which one it was because my head was just everywhere. I was just

[emotional] . . . .” For the second array, which included a photograph of Defendant,

Alvarez stated number seven—which was not Defendant’s photograph—looked like

the suspect. She stated she was not sure, because at the time of the incident she was

focused on the shooter, again implying she believed Spence to be the man who shot

Jones.

 -6-
 STATE V. MALONE

 Opinion of the Court

 The State showed Alvarez a photograph of Defendant which Alvarez testified

she saw on the Internet a week or two after the shooting. She testified the picture

looked more like Defendant as she recalled from the day of the shooting, than the

photos used in the array, because his hair was different. She stated when she first

saw the photograph on the Internet she was certain it was the man who shot Jones.

Alvarez made an in-court identification of Defendant.

 Alvarez further confirmed Lopez’s testimony regarding the 29 February

meeting with Smith. Lopez had previously asked Smith to keep her “informed of

what’s going to be happening in the courts” so Smith told her about the hearing taking

place on 29 February, and Alvarez decided to go. As soon as Smith showed Lopez and

Alvarez the updated photographs of Defendant, Alvarez instantly knew it was the

shooter.

 Alvarez asked Smith to view the video of Defendant’s interview with officers.

She stated:

 [W]e didn’t even watch it . . . five minutes because when
 that happened I was standing up. And I looked out the
 window and that’s when I saw him. And then I was, like,
 that’s him, that’s the guy that shot Kevette. And then after
 that, I told [Smith] I was, . . . leaving, and then [Claudia
 and I] both decided just to leave . . . . We didn’t stay to
 hear, . . . the court or anything.

 She confirmed Lopez’s testimony regarding watching Defendant exit the police

car in handcuffs and a jumpsuit. Alvarez stated no one told them the hearing taking

 -7-
 STATE V. MALONE

 Opinion of the Court

place was for the shooter, Smith did not indicate who was in the photograph, nor did

she suggest the man getting out of the car was the shooter. Smith did not pose any

questions regarding an identification of the man exiting the car, or the man in the

photographs.

 The State then called Iris Smith. Smith testified she asked Lopez and Alvarez

to come to the courthouse on 29 February to give them a copy of their interviews to

review for trial, and to show them updated pictures of Defendant and Spence. Smith

stated:

 I gave [Lopez and Alvarez] copies of their interviews and
 told them that [the District Attorney] wanted them to
 review their interviews that they had given with the police.
 And I pulled . . . some updated pictures, which the girls had
 already seen . . . on Facebook. . . .

 When Smith showed Alvarez the first picture, Alvarez pointed directly to

Defendant’s picture and exclaimed “that’s him, that’s the shooter, that’s the one that

shot Kevette.” Smith stated she only played the video of Defendant’s interview with

officers for approximately two or three minutes. Smith “couldn’t get [the video] to

work at first and then when [she] did get it to work . . . he wasn’t really saying

anything.” She confirmed both witnesses’ testimony regarding seeing Defendant get

out of the police car. Smith stated when Alvarez or Lopez spoke about the pictures,

 -8-
 STATE V. MALONE

 Opinion of the Court

or viewed Defendant in person, they were not prompted in anyway and Smith did not

ask them questions about whether they recognized Defendant.2

 Defendant offered no evidence and the court heard the parties on the motion

to suppress. Defendant argued the District Attorney’s office conducted impermissibly

suggestive identification procedures which created a substantial likelihood of

irreparable misidentification by showing Lopez and Alvarez Defendant’s interview,

photos of Defendant and Spence together after Spence had already been convicted,

and Defendant in-person, exiting the police car. After hearing both parties on the

motion, the trial court found the following facts.

 On [23 October] 2012, Anthony Kevette Jones was shot and
 killed at his residence. Claudia Lopez and Cindy Alvarez
 were at the scene of the shooting on Mr. Jones'[s] front
 porch, along with Mr. Jones.

 A blue car arrived at the scene. There were two black
 males in the car. The two males came into the area where
 Mr. Jones was located. The driver of the blue car spoke to
 Mr. Jones and essentially did most or all of the talking on
 behalf of the two males. The other male person, the
 passenger in the blue car, pulled a gun and shot Mr. Jones.
 That led to his death.

 That Claudia Lopez was ten feet away from Mr. Jones
 when he was shot. That Cindy Alvarez was four feet from
 the shooter when Mr. Jones was shot. [Lopez] and [Alvarez]

 2 The State also called Jerry Garner, a private investigator who served a subpoena on Alvarez
on 9 March. Upon serving the subpoena he learned someone had shown Alvarez several other
photographs, in addition to the photo arrays. Alvarez also told him the District Attorney had requested
she and Lopez attend the 29 February meeting at the courthouse to confirm her identification of
Defendant. Additionally, Alvarez told him “she went to the door of the courtroom and looked through
the glass and looked into the courtroom while [Defendant] was inside the courtroom.”

 -9-
 STATE V. MALONE

 Opinion of the Court

each gave some description of the two males giving some
information about clothing. [Lopez] also described that the
shooter had on a white T-shirt with shoulder length hair
and the speaker had [a] body piercing.

On [25 October] 2012, the Burlington Police Department
conducted an identification procedure with [Lopez] and
with [Alvarez]. Those procedures involved photographic
arrays, sometimes referred to by the officer as photo line-
ups.

In one array the Burlington Police Department used a
photo of Marquis Spence, who's a charged co-defendant in
. . . connection with this matter. So [they] used a photo of
Marquis Spence and seven fillers. Filler being seven folks
who are not involved or have been excluded from
involvement in the incident under investigation.

In the other array the Burlington Police Department used
a photo of [Defendant] and seven fillers. The Burlington
Police Department did not use a current photo of
. . . [D]efendant as reflected the current photo being
introduced into evidence as State's Exhibit No. 3. In part,
because the background in the photo was different from
others and that there was some concern about that causing
. . . [D]efendant's photo to stand out in the array.

Further, Marquis Spence's current photo showed him with
an eyebrow body piercing and Burlington Police
Department made the decision to attempt to locate a photo
without such piercing being in the photo so as not to cause
Marquis Spence's photo to stand out.

In . . . [D]efendant's current photo he had an unusual
expression on his face as interpreted by the officer that the
Burlington Police Department thought might make it
stand out.

The Burlington Police Department instead used an older
photo of . . . [D]efendant obtained from the Division of

 - 10 -
 STATE V. MALONE

 Opinion of the Court

Adult Correction website. In the photo that the Burlington
police used . . . [D]efendant's hairstyle, which the officer
characterized as being plats, was different from the
hairstyle in the current photo, which the officer
characterized as dreadlocks. So the older photo had plats.
Current photo dreadlocks.

[Lopez] identified [number four] Marquis Spence in the
array involving that co-defendant.

At [the] hearing she referred to that identified person as
the male who did the talking. She reported her level of
confidence on that identification as an eight on a scale of
one to ten.

On the second array, [Lopez] indicated that [number six],
which was . . . [D]efendant, looked like him but she was not
sure and she initialed that she had not -- did not have a
positive [identification].

[Alvarez] [identified] [number six], . . . which was Marquis
Spence. She indicated she had an 80% level of confidence
and 100% if he had long dreads, and added that . . . looked
like the one that shot Kevette. So she identified Marquis
Spence in that connection.

[Alvarez] in the second array identified [number seven].
This is the array that in which . . . [D]efendant's photo was
located. [She] [i]dentified [number seven] who is an
individual named Danny Lee Johnson whose photo was
included as a filler. But she indicated that she was not
sure. She noted she focused on the shooter because he had
his hands in his pocket the whole time.

[Lopez] and [Alvarez] each saw photos of . . . [D]efendant
and Marquis Spence in the online newspaper. These
photos were not among those that were shown to each of
them by the Burlington Police Department in the arrays.
No law enforcement officer showed either [Lopez] or
[Alvarez] anymore photos other than the ones shown

 - 11 -
 STATE V. MALONE

 Opinion of the Court

during the course of the arrays.

. . . [W]hen [Alvarez] saw the online newspaper photos of
. . . [D]efendant and Marquis Spence, she thought to
herself that these photos showed how they looked on the
day of the shooting.

Further, she thought that the photo of [D]efendant was of
the person who shot Kevette.

[Lopez] and [Alvarez] each went several years without
contact from the District Attorney's office or contacting the
District Attorney's office or without any further interaction
with law enforcement in connection with all these events.

Each had contact with Iris Smith, victim witness legal
assistant with the Alamance County District Attorney's
office in February of 2016 as trial date approached.

. . . [Lopez] and [Alvarez] each knew that there was going
to be a hearing in this case on [29 February] 2016, at the
Alamance County Historic Courthouse. Neither knew . . .
whether . . . [D]efendant would be present at the hearing.
Iris Smith arranged to meet with each on [29 February] in
the furtherance of her trial preparation duties. Because
Smith was at the Historic Courthouse attending to grand
jury matters, she advised [Lopez] and [Alvarez] . . . to meet
her at the District Attorney's office in that building.

Smith gave . . . [Lopez] and [Alvarez], a copy of her
respective statement to officers and showed them photos
she had obtained of . . . [D]efendant and Marquis Spence
off of the Internet.

Up to the point when Smith downloaded the Internet
photos, the only photos in the [District Attorney]'s file were
the ones used in the photo arrays done by the Burlington
Police Department some years earlier.

The . . . photos shown by Smith on [29 February] were the

 - 12 -
 STATE V. MALONE

 Opinion of the Court

 same photos that each [Lopez] and [Alvarez] had already
 seen in the online newspaper some time earlier.

 Smith also began showing each a video of . . . [D]efendant's
 statement to law enforcement officers. [Lopez] was seated
 at the time. [Alvarez] was standing near the window of the
 room in which they were meeting.

 [Alvarez] then stated, there he is, the one who shot
 Kevette. [Lopez] and Smith got up and went over to the
 window. At that time . . . [D]efendant was exiting alone
 from a patrol unit parked adjacent to the Historic
 Courthouse, accompanied by a law enforcement officer,
 dressed in an orange jumpsuit and in handcuffs.

 [Lopez] testified in court that she believed that [D]efendant
 was the person who shot Kevette and based on the events
 at the scene of the shooting and not the viewing of the
 photos at the District Attorney's office on [29 February] or
 the viewing of . . . [D]efendant exiting the law enforcement
 unit on that day or the statement that [Alvarez] made
 about . . . [D]efendant as he exited the unit.

 [Alvarez] testified in court that her identification of
 . . . [D]efendant was based on the events surrounding the
 shooting and not on the [29 February] 2016, events in the
 [District Attorney’s] office.

 Neither [Lopez] nor [Alvarez] knew . . . [D]efendant nor
 Marquis Spence prior to the date of the shooting. Assistant
 District Attorney Alex Dawson, the [prosecutor] in this
 case, was not present during the meeting on [29 February]
 2016, at the Historic Courthouse.

 Counsel are in near agreement, . . . that the amount of time
 that [Alvarez] and [Lopez] were in a position to observe the
 two males and the shooting was from 75 to 90 seconds. So
 I took that matter as not being in dispute . . . .

Turning to whether the witnesses’ in-court identifications of Defendant were

 - 13 -
 STATE V. MALONE

 Opinion of the Court

reliable and of independent origin, the trial court found the following.

 One of the first factors [in determining whether an
 identification is of independent origin] is the opportunity
 to view the crime. The [c]ourt finds that the time that
 [Lopez] and [Alvarez] had to view the two males and the
 shooting was a short period of time from 75 to 90 seconds.

 The [c]ourt does find that the event was a startling event,
 one that would claim your attention or cause you to pay no
 attention and flee from the situation.

 That . . . Lopez was within ten feet of the shooter on the
 porch where Mr. Jones was shot and when he was shot and
 . . . Alvarez was four feet from Mr. Jones when he was shot.
 That’s the opportunity to view. They were all on the porch
 together.

 [As to] [t]he degree of attention[,] [t]he [c]ourt finds that
 the two indicated that they were paying attention to the
 two males that came up and to Mr. Jones. The event was
 a startling event, one that would cause the event to stand
 out in their minds; that they gave a general description of
 clothing, hair and body piercing and the car and indication
 of who was driving the vehicle and who was the passenger
 in the vehicle.

 As to the accuracy of prior description . . . Lopez described
 the shooter as having shoulder length hair. . . .
 [D]efendant had shoulder length hair at or around the time
 of the shooting. At the arrays of the Burlington Police
 Department [Lopez] identified Marquis Spence as the main
 talker. . . . also being the driver of the vehicle. And [she]
 was not sure about . . . [D]efendant as the shooter and did
 not make a positive [identification]. She did linger over . . .
 [D]efendant’s photo during the course of the array.

 [Alvarez] identified Marquis Spence as the shooter and did
 not pick . . . [D]efendant as the other person [instead]
 picking a completely unassociated individual.

 - 14 -
 STATE V. MALONE

 Opinion of the Court

 [As to] [t]he level of certainty demonstrated at the
 confrontation, . . . [Alvarez] and [Lopez] had seen these
 photos before so they were not new photos. . . . Alvarez had
 recognized the photos as the two males as they looked at or
 around the time of the shooting.

 . . . [Lopez] and [Alvarez] each recognized . . . [D]efendant
 as he exited the law enforcement unit. Both appeared
 confident in their identifications during that event. . . .

 [In regard to] [t]he length of time between [the] crime and
 [the] confrontation[,] [t]here [were] approximately three
 and a half years between the shooting and the [29
 February] event. . . .

 The trial court considered these findings and concluded the “showing of the

photos, the video, and seeing . . . [D]efendant in person at the . . . [c]ourthouse on [29

February 2016], was not impermissibly suggestive.” The court also concluded “based

on the testimony of the two witnesses . . . in the courtroom, that those identifications

are of independent origin.”

 The case then proceeded to trial and the State called Callen Burnette.

Burnette testified at the time of the incident she lived in Durham with her friends

Arianna McCray and Lakreisha Shoffner. She initially met Defendant and Spence

approximately one month before the shooting and saw them again on three or four

occasions prior to the shooting. On two occasions they ordered pizza together, played

video games, and watched television. On one occasion they spent at least an hour to

an hour and a half together at McCray’s house. On another occasion Defendant and

 - 15 -
 STATE V. MALONE

 Opinion of the Court

Spence visited McCray’s house to drop off marijuana. Burnette never saw Defendant

and Spence separately and stated “[e]very time I [saw] them they were together.”

 On the date of the incident Burnette rode with Defendant and Spence from

Durham to Burlington because she had arranged a deal for Defendant and Spence to

purchase marijuana from her friend Jared Alston. Spence and Defendant met

Burnette and Shoffner at McCray’s house. Spence arrived driving a blue vehicle and

Defendant was in the passenger seat. They all left in the blue car and stopped at a

gas station to pick up McCray.

 When McCray arrived Burnette and Shoffner got into McCray’s vehicle.

Spence and Defendant then followed McCray’s car to Jones’s house on Avon Avenue.

When they arrived McCray introduced Alston to Defendant and Spence, then Alston

got into McCray’s car. Both vehicles left Avon Avenue and the group went to

Creekside Apartments. When they arrived Alston exited McCray’s car and got into

Spence’s car. Momentarily, he returned to McCray’s car and stated he would be back

in five minutes. After approximately fifteen minutes passed, Defendant looked into

McCray’s car and asked where Alston was. Burnette then got out of the car and

walked around the apartment complex looking for Alston. After forty-five minutes to

an hour passed without finding him, Defendant and Spence left stating they were

going back to Raleigh to make some money.

 - 16 -
 STATE V. MALONE

 Opinion of the Court

 Burnette, McCray, and Shoffner drove to Alston’s house but did not find him.

They then returned to Jones’s house. When they arrived there were several people

in the yard and on the front porch. Shoffner got out of the car and spoke with Tabias

Sellers, then quickly ran back to the car and they left.

 A few days later Burnette spoke with a detective and completed a photo line-

up. She identified Spence as the driver with 100% confidence; however she did not

identify Defendant and she stated she was not sure which man was the shooter. She

described the appearance of the two men, stating Spence had dreadlocks braided

back, to right under his jaw bone, and Defendant had short plats.

 The State showed Burnette the photo arrays and mug shots of Defendant and

Spence. Burnette recognized the mug shots from seeing them in the news. She

testified the mug shot of Defendant showed his hair in plats, hanging down, as she

remembered it on the day of the incident. However, Defendant’s photo used in the

line-up portrayed a different style—short braids which were straight back. She also

stated the photo used in the line-up appeared to be an older photo of Defendant.

 The State then called Lakreisha Shoffner. Shoffner confirmed Burnette’s

testimony concerning the occasions when they spent time with Defendant and

Spence. At the time of the incident Shoffner was “get[ting] to know [Defendant] a

little bit more than a friend” and was building a dating relationship with him.

Shoffner also confirmed Burnette’s testimony regarding the events which took place

 - 17 -
 STATE V. MALONE

 Opinion of the Court

on the day of the shooting. When they arrived at Creekside Apartments, Shoffner

watched Alston get out of McCray’s vehicle and into Spence’s car and “saw

[Defendant] hand [Alston] money from out of the glove box.” Alston then emerged

from the car with the money and did not return.

 Shoffner testified when they returned to Jones’s house “[she] saw everyone still

standing outside as if nothing ever occurred.” When she got out of the car she asked

where Alston was “[a]nd then [she] was informed . . . to not come up to the house.”

She saw Jones’s feet hanging out of the side of a vehicle as others were trying to

transport him to the hospital. She also saw a man with blood on his shirt. She

testified “[s]o then I just put two and two together, you know, to leave.” A few days

later officers administered a photo line-up to Shoffner. She positively identified

Spence with 100% confidence and positively identified Defendant with a confidence

level of 8.59 out of ten.

 The State then called Arianna McCray. McCray testified she met Defendant

and Spence in the summer of 2012 “[a]nd they started liking . . . me and . . . [Shoffner]

and we had started to build a friendship. . . .” She testified she thought the two men

were brothers and she had never seen the two separately. She confirmed the

testimony of Shoffner and Burnette concerning the events of 23 October.

 Officers administered a photo line-up to McCray on 25 October 2012. She

identified Spence with a confidence level of 100% and identified Defendant with

 - 18 -
 STATE V. MALONE

 Opinion of the Court

confidence level of 80%. She stated she was only 80% sure because the picture of

Defendant in the line-up showed him with a different hairstyle and he looked younger

in the picture.

 The State next called Claudia Lopez. Lopez testified on 23 October, she and

Alvarez were at Jones’s house, sitting on the porch when two men arrived in a blue

car, blocking the driveway. The men approached the front porch and asked Jones

where Alston was, claiming Alston “had [run] off with some . . . money.” Jones replied

he did not know, “[t]he last time I saw him he left with you guys.” The driver then

asked for Alston’s phone number, and Jones said he did not have it. The driver

responded “that’s your man, what do you mean you don’t have his number.” Then

Micah White, who was also on the porch stated “we don’t have his number. He’s

always calling from different phones.” At that point the shorter of the two men said

“b***s***” and the shooting began.

 While the conversation was going on Lopez noticed the shorter man was

holding his right pocket as if he had a gun in it and “[i]t looked like he had his finger

on the trigger.” “Right after he said [b***s***], he pulled a gun out of his . . . pocket

and started shooting.” She heard four or five shots then the men ran towards their

car.

 From the time the men got out of their car until the time they ran back to their

car after the shooting, only a minute or two had elapsed. Lopez stated one of the men

 - 19 -
 STATE V. MALONE

 Opinion of the Court

was “slightly taller and the other one was just a little bit shorter wearing a white t-

shirt.” The taller man drove the vehicle and did the talking; he had his hair braided

back and had an eyebrow piercing. The shorter man was the passenger. The shooter

wore a white t-shirt and his hair “was loose with little braids . . . up to his shoulders.”

The State showed Lopez a photograph, which Lopez identified as the shooter. She

also recognized the picture of Spence, who she identified as the talker and the taller

of the two men. Lopez made an in-court identification of Defendant as the shooter.

Defense counsel objected to this identification, but the court overruled the objection.

 The State next called Cindy Alvarez. Alvarez confirmed Lopez’s testimony

regarding the events on 23 October. She testified one of the men wore a white long-

sleeved shirt and the other wore a blue hooded coat. She also testified the passenger

kept his hands in his pocket, where she could see the tip of a gun. After noticing the

gun, she told Lopez they needed to leave. Lopez asked the driver to move, to which

he replied “he would move when he finished.” Then “[t]he passenger . . . turned

around and looked at the . . . driver . . . the driver turned around and looked at the

passenger . . . and, . . . nodded his head and that's when . . . the passenger started

shooting.” Alvarez identified Defendant in court as the shooter. The defense counsel

objected, but the court overruled Defendant’s objection.

 Brad Mills, a former detective with the Burlington Police Department, also

testified. Mills interviewed Alvarez following the incident, and stated she was very

 - 20 -
 STATE V. MALONE

 Opinion of the Court

emotional during the interview. Alvarez told him the driver was the one who did the

talking, was approximately five feet six inches tall, and wore a blue ball cap. She

described the shooter as the quiet one, with dark shoulder length dreadlocks, a

muscular build and slightly taller than the driver. However, during her voir dire

testimony she stated she did not know the heights of the suspects because she took

off running as soon as the shooting began.

 The State also called Micah White. White is an eyewitness to the shooting.

White stated the taller man did the talking and the shorter one had a gun in his

pocket. However, Officer Megan Coggins testified she interviewed Micah White

immediately after police were called to the scene of the incident and White stated the

shorter black male spoke and the taller black male was the shooter. On 25 October

2012, officers administered a photo line-up to White and he did not positively identify

either Defendant or Spence.

 The State then called Officer Steven Reed with the Burlington Police

Department.3 Officer Reed investigated the murder of Jones and interviewed

Defendant as a suspect. Defendant claimed he was not in Burlington at the relevant

time and he did not know where Burlington was, nor did he know Alston or Jones.

 3 The State called Dana Quirindongo as an expert in firearms identification, including the
identification and examination of bullets, firearms and casings. Quirindongo works in the North
Carolina State Crime Laboratory in the firearms unit. She testified in her opinion State’s Exhibits 34,
35, and 36 were all bullets shot from a caliber between .38 or .357 and in her opinion all three of the
projectiles were fired from the same firearm.

 - 21 -
 STATE V. MALONE

 Opinion of the Court

Defendant was arrested at Spence’s house and the blue vehicle was parked outside.

Defendant claimed he had never been in that vehicle nor did he recall ever seeing it.

 The State’s final witness was Tabias Sellars. Sellars testified the day of the

shooting he was at Jones’s house and was at the front door ready to leave when he

saw a blue car arrive and two men approach the house. He testified the man who

spoke was the driver; he was tall, light skinned, and had dreadlocks. The driver said

“[y]our boy [Alston] just beat me out of $1,200” and he asked where Alston was.

Sellars described the shooter as the one who did not speak. On cross examination

Defense counsel elicited testimony concerning a plea agreement Sellers offered to

make in exchange for testifying in this case.4

 At the close of all the evidence Defendant moved to dismiss the charge of

assault with a deadly weapon with intent to kill inflicting serious injury and the

charge of first-degree murder. The court denied both motions.

 II. Standard of Review

 Our review of a trial court’s denial of a motion to suppress is “strictly limited

to determining whether the trial judge’s underlying findings of fact are supported by

competent evidence, in which event they are conclusively binding on appeal, and

whether those factual findings in turn support the judge’s ultimate conclusions of

 4 The State recalled Detective King who testified the Durham police department executed a
search warrant of Spence’s house. A blue Hyundai elantra was located outside the home and the
officers found a container of six .38 caliber unfired bullets.

 - 22 -
 STATE V. MALONE

 Opinion of the Court

law.” State v. Cooke, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). “The trial court’s

conclusions of law, . . . are fully reviewable on appeal.” State v. Hughes, 353 N.C. 200,

208, 539 S.E.2d 625, 631 (2000).

 Although Defendant did not preserve his EIRA claim for appellate review, he

requests that we review this issue for plain error. Because we find error in

Defendant’s due process claim we need not address Defendant’s EIRA argument.

 III. Analysis

 On appeal, Defendant argues the legal assistant’s 29 February meeting with

Lopez and Alvarez constituted an identification procedure which violated due process

of law and the EIRA. Defendant contends the trial court erred in denying his motion

to suppress the eyewitness identification. Specifically, he challenges the trial court’s

finding that Lopez made a confident identification of Defendant on 29 February.

Defendant also challenges the trial court’s conclusion the identification procedures

were not impermissibly suggestive, and the identifications had an independent

origin. We find Defendant’s argument to be persuasive.

 When “lineup and confrontation procedures [are] so impermissibly suggestive

as to give rise to a very substantial likelihood of irreparable misidentification [they]

violate due process and are constitutionally unacceptable.” State v. Smith, 278 N.C.

476, 481, 180 S.E.2d 7, 11 (1971) (citation and quotation marks omitted). To

determine whether identification procedures violate due process, North Carolina

 - 23 -
 STATE V. MALONE

 Opinion of the Court

courts apply a two-part inquiry. State v. Fowler, 353 N.C. 599, 617, 548 S.E.2d 684,

698 (2001).

 First we must determine whether an impermissibly
 suggestive procedure was used in obtaining the out-of-
 court identification. If this question is answered in the
 negative, we need proceed no further. If it is answered
 affirmatively, the second inquiry is whether, under all the
 circumstances, the suggestive procedures employed gave
 rise to a substantial likelihood of irreparable
 misidentification.

State v. Hannah, 312 N.C. 286, 290, 322 S.E.2d 148, 151 (1984) (citations omitted).

“The test under the first inquiry is ‘whether the totality of the circumstances reveals

a pretrial procedure so unnecessarily suggestive and conducive to irreparable

mistaken identity as to offend fundamental standards of decency and justice.’”

Fowler, 353 N.C. at 617, 548 S.E.2d at 698 (quoting Hannah, 312 N.C. at 290, 322

S.E.2d at 151).

 The second inquiry requires a determination of whether the identification

procedures created a substantial likelihood of irreparable misidentification.

“Whether there is a substantial likelihood of misidentification depends upon the

totality of the circumstances.” State v. Pigott, 320 N.C. 96, 99, 357 S.E.2d 631, 633

(1987). “Even when a pre-trial procedure is found to be unreliable, in-court

identification of independent origin is admissible." State v. Garner, 136 N.C. App. 1,

11-12, 523 S.E.2d 689, 697 (1999). Our courts consider the following factors when

determining whether an identification is of independent origin and sufficiently

 - 24 -
 STATE V. MALONE

 Opinion of the Court

reliable:

 1) [t]he opportunity of the witness to view the criminal at
 the time of the crime;
 2) the witness’ degree of attention;
 3) the accuracy of the witness’ prior description;
 4) the level of certainty demonstrated at the confrontation;
 and
 5) the time between the crime and the confrontation.

Pigott, 320 N.C. at 99-100, 357 S.E.2d 631, 634. These factors must then be weighed

against “the corrupting effect of the suggestive procedure itself.” Id. at 100, 357

S.E.2d at 634.

 Defendant first contends the trial court erred in concluding the pretrial

identification procedures were not impermissibly suggestive. Defendant argues:

 Sandwiching a viewing of the perpetrators committing the
 homicide in between viewings of [Defendant’s] photograph
 and his police interrogation was extremely suggestive and
 improper, affecting not only their identification of
 [Defendant], but their memories of the style and color of
 clothing worn by the perpetrators, and any other details
 visible in the video.

After careful de novo review of the trial court’s conclusion of law, we agree.

 The evidence admitted at trial demonstrates after the shooting neither Lopez

nor Alvarez were able to give detailed descriptions of Defendant or positively identify

Defendant. Then, nearly three and a half years later and approximately two weeks

prior to trial, the witnesses met with Smith, viewed a video of Defendant’s interview,

surveillance footage of the incident, and more recent photographs of Defendant. It is

 - 25 -
 STATE V. MALONE

 Opinion of the Court

likely the witnesses would assume Smith showed them the photographs and videos

because the individuals portrayed therein were suspected of being guilty.

 Although neither the video interview nor the surveillance footage were

admitted during the suppression hearing, we reviewed this evidence in order to

determine the suggestive nature of the identification procedures. The surveillance

video does not present a view of Jones’s front porch, therefore there is no footage of

the actual murder. However, Jones’s driveway is clearly visible, and two men can be

seen fleeing the yard and entering a dark vehicle. One of the men is wearing a

noticeably white shirt. Defendant’s interview with officers clearly shows him wearing

a white shirt and ball cap. Even watching only a minute of the footage would allow

the witnesses ample opportunity to view Defendant’s features, searing his image into

their memory before trial.

 We must also consider whether the pretrial identification procedure “was so

suggestive that there is a substantial likelihood of irreparable misidentification” or

whether the in-court identification was of independent origin. Pigott, 320 N.C. at 99,

357 S.E.2d at 633; Garner, 136 N.C. App. at 11-12, 523 S.E.2d at 697. In reviewing

the trial court’s factual findings regarding this issue, we determine several of those

findings were not supported by competent evidence.

 First, the trial court found both witnesses paid attention to Defendant at the

scene; this finding is not supported by the evidence. Although the trial court correctly

 - 26 -
 STATE V. MALONE

 Opinion of the Court

found the witnesses had 75 to 90 seconds to view the suspects, it was a startling event

which may have caused them to pay close attention, and the witnesses were in close

proximity to the shooter, the trial court ignored the witnesses’ own testimony

indicating they in fact had not paid attention to Defendant. Lopez testified “I never

really paid much attention to [Defendant’s] face because the whole time he was

standing in front of us he just had his hand in his pocket.” And although Alvarez

testified she “pa[id] attention to [Defendant] the minute he got out of the car[,]” the

day after the incident she identified Spence as the shooter and was unable to identify

Defendant in the line-up. We find the evidence clearly shows a lack of attention to

Defendant.

 The trial court also considered the accuracy of the witnesses’ description at the

time of the incident. Here, neither witness gave a detailed description of Defendant.

When Lopez spoke with detectives the night of the shooting she described Defendant

as shorter than the other man, wearing a white t-shirt, and the passenger of the

vehicle. She stated she could not remember any of his features, admitting she did

not pay attention to Defendant’s face. Alvarez initially described Defendant as quiet,

and having dark dreadlocks to his shoulders and dark freckles. Yet, she admitted at

trial Defendant does not have dark freckles. Furthermore, neither eyewitness

positively identified Defendant in a photo line-up administered only two days after

the shooting.

 - 27 -
 STATE V. MALONE

 Opinion of the Court

 The trial court found both Lopez and Alvarez recognized Defendant on 29

February when he exited the police car. However, the State concedes this finding is

inaccurate as only Alvarez identified Defendant at that time. There is no evidence in

the record to demonstrate Lopez made any such identification of Defendant during

the meeting on 29 February. In fact, Lopez testified during the voir dire hearing her

in-court identification was the first clear identification she had made of Defendant.

 Finally, the trial court considered the length of time between the crime and the

confrontation and noted nearly three and a half years passed between the date of the

incident and the identification procedures of 29 February.

 Considering these facts we determine they do not support the trial court’s

conclusion the witnesses’ in-court identifications of Defendant were of independent

origin. The short amount of time the witnesses had to view Defendant, their inability

to positively identify Defendant two days after the incident, and their inconsistent

descriptions demonstrate it is improbable that three and a half years later they could

positively identify Defendant with accuracy absent the intervention by the District

Attorney’s office. Thus, we conclude the identification procedures of 29 February

were impermissibly suggestive and were not of independent origin. Therefore, they

violated Defendant’s due process rights.

 We do not find evidence in the record which supports Defendant’s argument

Smith subjected Lopez and Alvarez to an impermissible show-up procedure. A “show-

 - 28 -
 STATE V. MALONE

 Opinion of the Court

up” is a procedure “whereby a suspect is shown singularly to a witness . . . for the

purposes of identification.” State v. Harrison, 169 N.C. App. 257, 262, 610 S.E.2d

407, 412 (2005). Both the United States Supreme Court and the North Carolina

Supreme Court “have criticized the ‘practice of showing suspects singly to persons for

the purpose of identification, and not as part of a lineup.” State v. Oliver, 302 N.C.

28, 44-45, 274 S.E.2d 183, 194 (1981) (quoting Stovall v. Denno, 388 U.S. 293, 302, 18

L. Ed. 2d 1199, 1206 (1967)). Show-ups “may be inherently suggestive because the

witness would likely assume that the police had brought [him] to view persons whom

they suspected might be the guilty parties.” State v. Oliver, 302 N.C. at 45, 274 S.E.2d

at 194 (internal citations omitted) (alterations in original). Nevertheless, “pretrial

show-up identifications are not per se violative of a defendant’s due process rights.”

State v. Watkins, 218 N.C. App. 94, 105, 720 S.E.2d 844, 851 (2012) (internal citations

omitted). The EIRA restricts the manner in which state, county and local law

enforcement officers may conduct show-ups. N.C. Gen. Stat. § 15A-284.52(c1) (2015).

The statute provides:

 (1) A show-up may only be conducted when a suspect
 matching the description of the perpetrator is located in
 close proximity in time and place to the crime, or there is
 reasonable belief that the perpetrator has changed his or
 her appearance in close time to the crime, and only if there
 are circumstances that require the immediate display of a
 suspect to an eyewitness.

 (2) A show-up shall only be performed using a live suspect
 and shall not be conducted with a photograph.

 - 29 -
 STATE V. MALONE

 Opinion of the Court

 (3) Investigators shall photograph a suspect at the time
 and place of the show-up to preserve a record of the
 appearance of the suspect at the time of the show-up
 procedure.

 There is no evidence in the record to support Defendant’s argument the

witnesses looking outside the courthouse window at the exact moment Defendant

exited a police car was a coordinated act by the District Attorney’s office to have the

witnesses view Defendant in-person. Although the circumstances seem suspicious,

we cannot determine the District Attorney’s office conducted an impermissible show-

up. Nonetheless, the witnesses viewing the photographs, surveillance footage, and

Defendant’s interview did constitute impermissible identification procedures.

 Defendant also contends the identification procedures violated several

requirements of the EIRA. The State alleges the EIRA is inapplicable in this case as

the identification procedures were conducted by a legal assistant, not a law

enforcement officer, and the plain language of the EIRA applies only to law

enforcement officers. We find the State’s argument is without merit. We address

this argument only to state the EIRA was enacted “to protect [d]ue [p]rocess rights

during identification procedures.” State v. Gamble, ___ N.C. App. ___, ___, 777 S.E.2d

158, 163 (2015). Therefore, as a general matter, to protect the due process rights of

defendants, all eyewitness identification procedures should comply with the

requirements of the EIRA.

 - 30 -
 STATE V. MALONE

 Opinion of the Court

 Because we find the procedures violated the due process rights of Defendant,

we must next decide whether the error was prejudicial.

 (a) A defendant is prejudiced by errors relating to
 rights arising other than under the Constitution of the
 United States when there is a reasonable possibility that,
 had the error in question not been committed, a different
 result would have been reached at the trial out of which the
 appeal arises. . . .
 (b) A violation of the defendant’s rights under the
 Constitution of the United States is prejudicial unless the
 appellate court finds that it was harmless beyond a
 reasonable doubt. . . .

N.C. Gen. Stat. § 15A-1443. A constitutional right is involved, thus, Defendant is

prejudiced unless admission of the testimony was harmless beyond a reasonable

doubt.

 We cannot determine the admission of the identification testimony was

harmless beyond a reasonable doubt. The only eyewitnesses to the murder who

testified at trial were Lopez, Alvarez, Sellars, and White. None of these eyewitnesses

positively identified Defendant as the shooter immediately after the incident. White

never made a positive identification. Sellars identified Defendant’s mug-shot, but did

not make an in-court identification and Defendant contends Sellars’ testimony was

not credible. Lopez and Alvarez made in-court identifications of Defendant only after

they were subject to the pretrial identification procedures conducted by the District

Attorney’s office. The only witnesses who positively identified Defendant in a photo

line-up―Shoffner and McCray―were not present at the scene at the time Jones was

 - 31 -
 STATE V. MALONE

 Opinion of the Court

murdered. Much of the remaining testimony as to who the shooter was is

contradictory. Thus, we cannot say the court’s error was harmless beyond a

reasonable doubt.

 The dissenting opinion asserts any error committed by the trial court was

harmless. However, as noted above, because Defendant’s due process rights are

implicated, any error is deemed prejudicial unless the Court finds such error was

harmless beyond a reasonable doubt. The dissenting opinion may be correct under

the ordinary prejudicial error standard. However, under the heightened standard,

which we must apply, we cannot say the error was harmless beyond a reasonable

doubt.

 IV. Conclusion

 In sum, after careful review we hold the error is prejudicial and award

Defendant a new trial.

 PREJUDICIAL ERROR AND NEW TRIAL.

 Judge ARROWOOD concurs.

 Judge DILLON dissents in a separate opinion.

 - 32 -
 No. COA16-1290 – STATE v. MALONE

 DILLON, Judge, dissenting.

 Defendant was convicted of murder. On appeal, he argues that the trial court

erred in allowing two eyewitnesses – Ms. Alvarez and Ms. Lopez – to offer testimony

in court identifying Defendant as the shooter. Defendant contends that their

testimonies were tainted by an unnecessarily suggestive pre-trial identification

procedure by the prosecutor. Specifically, shortly before trial, the prosecutor met

with Ms. Alvarez and Ms. Lopez and showed them a picture and video of Defendant,

purportedly to aid their trial testimony. For the reasons stated below, I believe that

Judge Roberson properly admitted the testimony of Ms. Alvarez, and that if it was

error to admit Ms. Lopez’s in-court identification, such error was harmless beyond a

reasonable doubt. Therefore, my vote is “no reversible error.”

 Regarding Ms. Alvarez’s testimony, assuming that her meeting with the

prosecutor was impermissibly suggestive, Judge Roberson’s findings show that Ms.

Alvarez’s in-court identification was of an origin independent from her meeting with

the prosecutor. For example, evidence showed that Ms. Alvarez stood close to

Defendant during the shooting and focused her attention on him, and she testified

that she was sure that the shooter was Defendant – long before her meeting with the

prosecutor – after seeing a picture of Defendant on the news shortly after the

shooting. See State v. Fisher, 321 N.C. 19, 24, 361 S.E.2d 551, 554 (1987) (noting that

a witness identification based on a newspaper photo does “not result from state action

[and therefore does] not violate defendant’s due process rights”).
 STATE V. MALONE

 DILLON, J., dissenting

 Regarding Ms. Lopez’s testimony, I believe that any error committed in

admitting her in-court identification was harmless beyond a reasonable doubt

because the other overwhelming evidence showed that Defendant and his friend,

Marquis Spence, were the two people who arrived in the blue car at the victim’s house

and participated in the shooting of the victim. Specifically, the overwhelming

evidence shows as follows:

 Several witnesses confirmed that two hours before the shooting, it was

Defendant and Mr. Spence who arrived at the victim’s house in Mr. Spence’s

distinctive blue car to pick up Skip (a friend of the victim’s) to go to a nearby location

to conduct a drug transaction; shortly thereafter, Defendant and Mr. Spence were

seen leaving the nearby location alone in the blue car after Skip left the location with

their $1,200, but had failed to return with the drugs; and Defendant and Mr. Spence

left the nearby location shortly before two men arrived at the victim’s house in a blue

car looking for Skip, complaining that Skip had just run off with their $1,200.

 Ms. Alvarez, who witnessed the shooting but did not know Defendant,

positively identified Defendant as the shooter in court.

 The victim himself, as evidenced by the testimony of Ms. Lopez, identified

Defendant as a participant in his murder. The victim had seen Defendant and Mr.

Spence pick up Skip from his house a few hours before two men came to his house

and killed him. Ms. Lopez testified that the victim exclaimed that the two men who

 2
 STATE V. MALONE

 DILLON, J., dissenting

arrived up two hours later were the same two men who had come earlier to pick up

Skip. Specifically, Ms. Lopez stated that when the two men arrived in the blue car

looking for Skip and their $1,200, the victim told the two men that the last time he

saw Skip, “he had left with you guys.” (Emphasis added.)

 Another witness to the shooting who had seen Skip leave earlier with Mr.

Spence and Defendant testified that when the two men pulled up two hours later

looking for Skip, he “told them . . . [w]herever you took him to, that’s where you need

to back trace him.”

 Other witnesses testified that Defendant and Mr. Spence were neighbors in

Durham, spent a lot of time together, and were together at Mr. Spence’s house with

the blue car out front when they were arrested.

 Defendant did not testify at trial.

 Based on the evidence, the jury determined that the same two men who arrived

at the victim’s house in a blue car to pick up Skip to pay him $1,200 for drugs were

the same two men who returned to the victim’s house a few hours later in a blue car

looking for Skip and complaining to the victim that Skip had taken their $1,200. I

conclude that even if Ms. Lopez had not been allowed to identify Defendant in court,

it is beyond a reasonable doubt that the jury still would have convicted Defendant

based on all the other evidence. Her in-court identification merely corroborated the

other evidence offered by the State. And if Ms. Lopez had not met with the prosecutor

 3
 STATE V. MALONE

 DILLON, J., dissenting

before the trial, there is no indication that Ms. Lopez would have testified that

Defendant was not the shooter. Indeed, when she was shown a photo line-up by the

police shortly after the shooting, she selected Defendant’s photograph as identifying

one of the two individuals involved in the victim’s death, though she indicated that

she was not sure.

 4